## Charles GOODMAN, et al.

### v.

## LUKENS STEEL COMPANY, et al.

### Civ. A. No. 73–1328.

United States District Court,
E.D. Pennsylvania.

Feb. 13, 1984.

---

⬤➙38

**1118**

William Ewing, Arnold Borish, Philadelphia, Pa., for plaintiffs.

Robert M. Landis, Philadelphia, Pa., for defendants.

David Silberman, Philadelphia, Pa., for Union.

OPINION AND ORDER

FULLAM, District Judge.

INTRODUCTION

|                                          | Page |
|------------------------------------------|------|
| *Review of Legal Principles*             |      |
| A.  Title VII and § 1981                 | 1119 |
| B.  Limitations Periods                  | 1121 |
| *Findings of Fact and Discussion*        |      |
| I.  Parties                              | 1123 |
| II.  Jurisdiction and Procedural Matters | 1123 |

III.   Background Information Concerning the Organization of the Work Force at Lukens ............ 1124

III–A.   Introduction to Findings on the Merits ............ 1126

IV.   The Bona Fide Nature of the Seniority System ............ 1128

V.   Racial Disparities Attributable to Impacts of the Seniority System, and Therefore Not Actionable ............ 1129

VI.   Initial Job Assignments During the Limitations Period ............ 1129

VII.   Access to Salaried Positions ............ 1144

VIII.   Racial Harassment at Lukens ............ 1147

IX.   Miscellaneous Matters ............ 1151

X.   Plaintiffs' Claims Against the Union Defendants ............ 1157

XI.   Individual Claims ............ 1160

XII.   Conclusions ............ 1163

## INTRODUCTION

Plaintiffs in this class action alleging racial discrimination in employment seek equitable and monetary relief against both the defendant employer, Lukens Steel Company, and the defendant labor unions, the International and two local unions of the United Steelworkers of America. This Opinion addresses liability issues.

## REVIEW OF LEGAL PRINCIPLES

### A.   *Title VII and § 1981*

■ Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, is "a broad remedial measure, designed 'to assure equality of employment opportunities.'" *Pullman-Standard v. Swint*, 456 U.S. 273, 102 S.Ct. 1781, 1783–84, 72 L.Ed.2d 66 (1982) (quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 800, 93 S.Ct. 1817, 1823, 36 L.Ed.2d 668 (1973)). The Act bars not only overt employment discrimination—discrimination by disparate *treatment*—but also policies that are superficially neutral but discriminatory in operation—discrimination by disparate *impact.* *Griggs v. Duke Power Co.*, 401 U.S. 424, 431, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971). Both types of discrimination are here alleged both by the individual plaintiffs and by the plaintiff class.

■ As the Supreme Court has noted, disparate treatment is the most easily understood type of discrimination. The employer simply treats some people less favorably than others because of their race, color, sex, or national origin. Proof of discriminatory motive is critical, although it can in some situations be inferred from the mere fact of differences in treatment. *International Brotherhood of Teamsters v. U.S.*, 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977). The plaintiffs must show "not only 'the existence of disparate treatment but also that such treatment was caused by purposeful or intentional discrimination.'" *Smithers v. Baular*, 629 F.2d 892, 895 (3d Cir.1980) (citations omitted).

■ The standard method of proving disparate treatment entails three steps. First, plaintiffs must establish a *prima facie* case. Next, the employer must articulate a legitimate business justification for its actions. If the employer does so, plaintiffs must then demonstrate that the proffered justification is merely a pretext for intentional discrimination. *McDonnell Douglas*, 411 U.S. at 804, 93 S.Ct. at 1825. Although the burden of production thus shifts from the plaintiff to the defendant and back again, the burden of persuasion remains with the plaintiffs throughout. *See Texas Department of Community Af-*

*fairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). In the Title VII context, the term *"prima facie* case" refers to the "establishment of a legally mandatory, rebuttable presumption" rather than the presentation of "enough evidence to permit the trier of fact to infer the fact at issue." *Id.* at 254 n. 7, 101 S.Ct. at 1094 n. 7 (1981).

The *McDonnell Douglas* plaintiffs alleged only discrimination in hiring; the particular elements of the *prima facie* case there identified have been modified to cover discrimination in other contexts. *See* B. Schleir & P. Grossman, Employment Discrimination Law (2d ed. 1983) 1318–1321 nn. 82–90 (collecting and discussing cases on discharge, discipline, promotion, transfer, layoff, training, and job assignment).

Although an individual alleging disparate treatment is free to introduce direct evidence of a discriminatory intent, as a practical matter plaintiffs typically must rely on indirect evidence from which an inference of such intent can be drawn. Frequently, plaintiffs argue that the employer applied various policies differently to black and white employees; in response, the employer attempts to show that those comparisons are faulty because of factual dissimilarities. As trier of fact, the trial court must resolve these competing claims. *See, e.g., Worthy v. U.S. Steel Corp.,* 616 F.2d 698, 702–03 (3d Cir.1980).

■ At least in theory, the *McDonnell Douglas* analysis is also applicable to class actions alleging a "pattern or practice" of classwide disparate treatment. *Teamsters,* 431 U.S. at 355, 97 S.Ct. at 1854. The class plaintiffs must initially demonstrate, by a preponderance of the evidence, that a pattern of disparate treatment exists and is the defendant's regular and standard operating procedure. *Id.* Such evidence frequently takes the form of statistical data. *See Hazelwood School District v. U.S.,* 433 U.S. 299, 307–08, 97 S.Ct. 2736, 2741, 53 L.Ed.2d 768 (1977); *Wilmore v. City of Wilmington,* 699 F.2d 667 (3d Cir.1983). Once plaintiffs have produced such data, the defendant may rebut by showing flaws in the data or the statistical analysis. Absent a persuasive rebuttal, the court will infer that all class members were discriminated against in the fashion alleged.

■ The second, and more prevalent, theory of liability under Title VII allows plaintiffs to challenge employment policies which, though neutral on their face, are discriminatory in operation. These "disparate impact" cases do not require proof of discriminatory motive. *Griggs,* 401 U.S. at 432, 91 S.Ct. at 854. In *Griggs* and its progeny, especially *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975), the Supreme Court has articulated the procedure for proving such claims. The plaintiffs must first establish a *prima facie* case that the challenged procedure does in fact have a substantial adverse impact. Plaintiffs must also demonstrate "a causal connection between the challenged policy or regulation and a racially unequal result." *EEOC v. Greyhound,* 635 F.2d 188, 193 (3d Cir.1980). The defendants can then attempt to demonstrate that those statistics are deficient and thus insufficient to make out a *prima facie* case. *Dothord v. Tawlindson,* 433 U.S. 321, 331, 97 S.Ct. 2720, 2727, 53 L.Ed.2d 786 (1977).

■ If plaintiffs succeed in establishing a *prima facie* case, defendant must justify the challenged policy as job-related or otherwise a business necessity. *Albemarle,* 422 U.S. at 425, 95 S.Ct. at 2375. The burden of persuasion, however, remains with the plaintiffs; defendant's rebuttal burden is simply to "come forward with evidence to meet the inference of discrimination raised by the *prima facie* case." *Croker v. Boeing Co.,* 662 F.2d 975, 991 (3d Cir.1981 (*en banc* )). If the defendant does so, plaintiffs must then show that "a feasible yet less onerous alternative exists." *Id.* (citations omitted). It has long been established that properly validated job-related tests are permissible even if they have a disparate impact. *Griggs,* 401 U.S. at 433–36, 91 S.Ct. at 854–856. Similarly, a bona fide seniority system—one which was not adopted with intent to dis-

criminate—does not violate Title VII even though it has a discriminatory effect. *Teamsters*, 431 U.S. at 348–55, 97 S.Ct. at 1861–1864.

*Section 1981*

■ Section 1981 prohibits intentional racial discrimination in making and enforcing contracts and in securing "equal benefit of all laws and proceedings." 42 U.S.C. § 1981. Proof of discriminatory intent is crucial; the provision "does not extend to facially neutral conduct having the consequences of burdening one race more than the other." *Croker*, 662 F.2d at 989. Although disparate impact thus is not itself actionable under § 1981, evidence of such impact "may be an important factor in proving racially discriminatory intent." *Id.*

■ Variations on the *McDonnell Douglas* formula for making out a *prima facie* case have also been applied in § 1981 cases. *See, e.g., Baldwin v. Birmingham Board of Education*, 648 F.2d 950, 955 (5th Cir.1981); *Tagupa v. Board of Directors*, 633 F.2d 1309, 1312 (9th Cir.1980). As under Title VII, once the plaintiffs have made a *prima facie* case, defendant must show a legitimate reason for its actions; thereafter, plaintiffs must show defendant's proffered reason is merely a pretext. *Baldwin*, 648 F.2d at 956.

■ To summarize, "disparate treatment" means simply that on a given occasion, one or more employees were treated less favorably because of their race; "pattern or practice" means simply a generalized version of this phenomenon; and "disparate impact" means simply that facially neutral policies or decisions have had a different, and adverse, impact on employees of a particular race.

One must be careful not to over-categorize in this context. The analytical distinctions outlined above are of only limited utility. The ultimate questions to be answered are essentially the same in all employment discrimination cases: Has the defendant caused a given employee or group of employees to be discriminated against? Because of race? Because of something that occurred within the limitations period?

If the answers to all of these questions are in the affirmative, is the action or conduct complained of justifiable, by reason of business necessity, a bona fide seniority system, or other legitimate factor? Both statistical and anecdotal evidence may be looked to in attempting to answer these questions (with, obviously, varying degrees of relevance and probative force).

Finally, a word about "intentional discrimination" or "discriminatory animus." The aim of the law is equality of treatment and equality of opportunity for all races. Attainment of that lofty goal can be expected, in the long run, to ameliorate subjective racial attitudes, but such attitudes are not directly implicated in the enforcement scheme. An employer who hates Jews or Negroes, but who suppresses those feelings and treats all races and creeds evenhandedly, is not in violation of either Title VII or § 1981. On the other hand, an employer who admires and respects all races equally, but who knowingly excludes qualified blacks from consideration for promotion because they are black, is guilty of intentional discrimination. An employer may inadvertently discriminate (as, for example, if the employer is unaware of the racial identity of the affected employee, or is unaware of the adverse treatment); there is no liability for such inadvertent consequences because, without more, an inference of an intent to discriminate on racial grounds would not be supportable. But an employer who persists in implementing racially neutral policies or practices with actual awareness that they adversely affect blacks in comparison to similarly situated whites, is, in the absence of some overriding justification (such as adherence to a bona fide seniority system, or business necessity/job-relatedness) in violation of Title VII.

## B. *Limitations Period*

■ This action was instituted on July 14, 1973. The appropriate limitations period for claims arising under 42 U.S.C. § 1981 is six years (derived from the then-pertinent Pennsylvania statute, 12 P.S.

§ 31). *Davis v. U.S. Steel Supply*, 581 F.2d 335 (3d Cir.1978).

■ The applicable limitations period for claims arising under Title VII of the Civil Rights Act is set forth in § 706(e) of that statute, 42 U.S.C. § 2000e–5(e), as amended in 1972. The 1972 amendments apply to all cases in which charges were then pending before the EEOC. In the present case the plaintiffs Dantzler, Hicks, Goodman, Meeks and Middleton had charges pending before the EEOC when the 1972 amendments became effective. In these circumstances, the limitations period is measured from the original filing date in each case, not merely from the effective date of the 1972 amendments. See *Wood v. Southwestern Bell Telephone Co.*, 580 F.2d 339 (8th Cir.1978); *Inda v. United Airlines*, 565 F.2d 554, 560–61 (9th Cir. 1977), *cert. denied*, 435 U.S. 1007, 98 S.Ct. 1877, 56 L.Ed.2d 388 (1978); *Dickerson v. United States Steel Corp.*, 439 F.Supp. 55, 69, n. 11 (E.D.Pa.1977), *vacated on other grounds, sub. nom. Worthy v. United States Steel Corp.*, 616 F.2d 698 (3d Cir. 1980).

■ It is clear that, with respect to the claims of the plaintiff class, all class members are entitled to the benefit of the earliest filing date of the named plaintiffs. *Wetzel v. Liberty Mutual Ins. Co.*, 508 F.2d 239, 246 (3d Cir.1975), *cert. denied*, 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 679 (1975). Indeed, there is authority for the proposition that all class members are entitled to the benefit of the earliest filing by any member of the class, whether or not named as a plaintiff. *Webb v. Westinghouse Electric Corp.*, 78 F.R.D. 645, 653 n. 3 (E.D.Pa.1978).

■ The plaintiff Dantzler first filed charges before the EEOC on December 7, 1970, followed by a related filing with the Pennsylvania Human Relations Commission on December 31, 1970. This action was filed within 90 days after Dantzler received his right-to-sue letter, and he was a member of the class. His bar-date, for all claims fairly encompassed within the

charges filed, is May 4, 1970 (300 days before March 1, 1971, the date 60 days following his initial filing with the Pennsylvania Human Relations Commission). In his original charges, Dantzler asserted a pattern of racial harassment, and discrimination in disciplinary decisions; his original charges named only Lukens as culpable. On August 10, 1972, Dantzler amended his charges to include the unions, and was thereafter permitted to intervene as a named plaintiff in this action.

The net effect of these circumstances, in my view, is that the entire class is permitted to assert Title VII claims against Lukens for the alleged pattern of racial harassment, and for discriminatory treatment in the administration of discipline, from and after May 4, 1970.

■ The named plaintiffs Goodman, Meeks, Hicks and Middleton filed broad-scale charges against both Lukens and the union, before the EEOC, on January 28, 1972. This produces a starting date of April 6, 1971, for (a) all claims against the union defendants, and (b) all claims against Lukens not encompassed within the original filing by the plaintiff Dantzler.

To summarize, the following claims are cognizable in this litigation: (1) all claims for intentional discrimination, in violation of 42 U.S.C. § 1981, arising after July 14, 1967; (2) claims for Title VII violations by the defendant Lukens, in the form of racial harassment and discriminatory discipline, arising after May 4, 1970; (3) all other claims for class-wide discrimination, against both Lukens and the union defendants, arising after April 6, 1971; and (4) irrespective of the class issues, the individual claims of disparate treatment asserted by those individual plaintiffs who have been issued right-to-sue letters by the EEOC.

■ Thus, nothing which occurred before July 14, 1967 can support the grant of any relief in this litigation. Evidence concerning pre-1967 events is relevant only to the extent it sheds light upon events which occurred during the limitations period.

And nothing which occurred before May 4, 1970, can support the grant of any relief in this litigation absent proof of discriminatory animus.

## FINDINGS OF FACT, AND DISCUSSION

### I. THE PARTIES

1. Named plaintiffs Charles Goodman, David Dantzler, Jr., Ramon Middleton, John R. Hicks, III, Dock L. Meeks, Lymas Winfield and Romulus Jones are black employees or former employees of the defendant Lukens Steel Company. Dantzler, Middleton, Hicks, Meeks and Goodman are or were hourly employees; Winfield has worked in both hourly and salaried positions; and Jones is a salaried employee. The named plaintiffs represent a class consisting of all black persons who are, or who at any time on or after June 14, 1967 have been, or who in the future may be, employed by Lukens.

2. Plaintiff United Political Action Committee ("UPAC") is an unincorporated association formed to combat race discrimination in Chester County. In 1973, 32 of its members were past or present employees of Lukens (and were black). UPAC had received many complaints of racial discrimination at Lukens before this suit was filed.

3. Defendant Lukens is the oldest independent steel company in continuous production in the United States, and produces a variety of specialty plate steel products. Lukens' major production facility is located in Coatesville, Pennsylvania, and Lukens is the largest employer in Chester County. Until the mid-1950s, Lukens actually consisted of three separate corporations: Lukens Steel Company, By-Products Steel Company and Lukenweld, Inc. During the period of time directly involved in this litigation, all had been merged into a single corporation, Lukens Steel Company.

4. The total Lukens work force since 1967 has varied between approximately 4,200 and 5,300 employees. The total number of hourly employees at Lukens since 1967 has ranged between approximately 2600 and 3900.

5. Between 1967 and 1978, the percentage of black employees in the hourly work force at Lukens ranged from 21.8% to 24.1%.

6. The defendant United Steelworkers of America ("the International Union") and its local unions, the defendant Unions 1165 and 2295 ("the Local Unions") are labor unions, and are the certified collective bargaining agents of Lukens' hourly employees.

A predecessor of the International Union, the Steelworkers Organizing Committee ("SWOC") became the certified collective bargaining agent of Lukens' hourly employees in 1937. At or about the same time, Local 1165 began to represent hourly employees of Lukens and By-Products Steel Company, and Local 2295 began to represent Lukenweld employees.

### II. JURISDICTION AND PROCEDURAL MATTERS

7. On December 7, 1970, named plaintiff David Dantzler, Jr. filed a charge of employment discrimination against Lukens with the Equal Employment Opportunity Commission ("EEOC"), alleging that he had been wrongfully terminated from employment on December 4, 1970, because of race. On December 31, 1970, Dantzler filed the same charge against Lukens with the Pennsylvania Human Relations Commission ("PHRC"). On August 10, 1972, Dantzler filed an amended charge of discrimination with the EEOC against both Lukens and Local 1165, alleging that, for reasons of race, Local 1165 had failed to represent him adequately in his disputes with Lukens.

8. On March 9, 1971, named plaintiff Ramon Middleton filed a charge of employment discrimination against Lukens with the Pennsylvania Human Relations Commission, alleging racial discrimination in the staffing of the (then new) Strand Casting Subdivision, on or about March 1, 1971.

9. On January 28, 1972, named plaintiffs Middleton, Goodman, Meeks and Hicks filed with the EEOC broad charges of pervasive racial discrimination by Lukens and the International Union. Middleton, Meeks and Hicks also named Local 1165 in these charges. At a later date, Hicks deleted the unions from his charges, and Meeks amended his charges by adding Local 2295.

10. In due course, the EEOC found no probable cause to believe Title VII violations had occurred with respect to the various individual charges, and issued "right-to-sue" letters as follows: to Goodman on March 14, 1973; to Dantzler on March 30, 1973; to Middleton on April 13, 1973; to Hicks on June 6, 1973; and to Meeks on December 12, 1973. Although finding no probable cause to support the individual complaints, the EEOC did make a finding to the effect that Lukens under-utilized black employees on a plant-wide basis, and "has excluded blacks as a class from its supervisory and clerical positions...." Because these findings relate to matters not encompassed within the specific charges then pending before the EEOC, they have no probative weight in the present case. They represent merely an adverse finding on issues which the company had never been called upon to defend. Their (marginal at best) relevance to this case is that they were communicated to Lukens and the unions, and therefore arguably should have alerted them to potential problems which should be addressed.

11. Plaintiffs Goodman, Middleton, Jones, Winfield and UPAC filed this suit on June 14, 1973. On June 16, 1975, the court granted plaintiffs Hicks, Dantzler and Meeks leave to intervene as parties plaintiff, and certified the case as a class action.

12. A hearing on plaintiffs' request for a preliminary injunction was held on October 2, 3, and 4, 1979. At the conclusion of the hearing, the court rendered certain oral findings of fact and conclusions of law, and granted partial relief in a written order dated October 9, 1979.

13. The trial encompassed 32 days of testimony, over the period from February through June 1980.

14. After the testimony was transcribed, the parties submitted voluminous requests for findings of fact and conclusions of law, comments upon their adversaries' requests, post-trial briefs, etc. Plaintiffs' requests for findings of fact number 693 (many with numerous subparagraphs), covering 345 pages. The defendant Lukens filed a 595-paragraph, 265-page "response," and also filed its own request for findings of fact, numbering 550, set forth in 290 pages. The unions' "comments" cover 260 pages plus 2 appendices; and the unions submitted 427 separate findings of fact, covering 353 pages. In all, these materials aggregate 1,773 pages.

In addition, plaintiffs submitted a 78-page post-trial brief; defendant Lukens' brief runs to 114 pages; the unions filed an 89-page brief with a 58-page appendix; and plaintiffs' reply brief totals 139 pages. Thus, the court was faced with some 478 pages of briefing. In addition, counsel have favored the court with a steady stream of letter-briefs clarifying, refining, and updating their respective positions.

III. BACKGROUND INFORMATION CONCERNING THE ORGANIZATION OF THE WORK FORCE AT LUKENS

A. *Hourly Work Force*

15. The relationship between Lukens' hourly employees and the company has been governed by collective bargaining agreements entered into every several years since 1937. Since 1957, these agreements have required hourly employees to hold union membership and pay union dues.

16. Lukens and the unions have regularly included in the Lukens' collective bargaining agreements the same terms and conditions adopted by the International Union and the largest nine or ten steel companies. This is known as "pattern bargaining."

17. Each hourly job at Lukens is assigned a job class rating, ranging from job class 1 to job class 27, which determines the average hourly wage rate for the job. For example, under the August 1, 1974 collective bargaining agreement, employees in job class 1 received a base wage rate of $4.305 per hour, while those holding job class 27 jobs received $6.805 per hour.

18. In accordance with the collective bargaining agreements, jobs rated at job class 5 and above, and one-third of the jobs rated in job class 4, are formally divided into job groups known as seniority subdivisions. As of July 14, 1973, there were 68 seniority subdivisions at Lukens.

19. All jobs rated at job classes 1, 2 and 3, and two-thirds of the jobs rated at job class 4, are not included within any seniority subdivision, but are part of one large job group known as the "pool". Since 1965, the pool jobs have been divided among seven "area pools," each of which relates to a group of seniority subdivisions. There are, however, some seniority subdivisions which have no related "area pool".

20. Lukens' hourly employees accumulate two kinds of seniority. "Company seniority" is based upon length of service as an employee of Lukens; "subdivision seniority" is measured by the duration of employment within a particular subdivision. Employees holding "pool" jobs do not accumulate any subdivisional seniority.

21. If an employee leaves a subdivision (for example, by way of layoff or voluntary transfer) and begins work in another subdivision, he continues to maintain the subdivisional seniority he had accumulated in his former unit. From the date he begins working in his new unit, however, he begins to accumulate subdivisional seniority only in that unit. Thus, an employee cannot accumulate subdivisional seniority in more than one subdivision at a time.

22. When a job vacancy occurs within a seniority subdivision, qualified employees actually holding jobs within that unit have the first preference to fill the vacancy, in order of their respective subdivisional seniority. The company is not required to provide formal notice of a job vacancy to employees within the unit where the vacancy occurs, and the practice of providing such notice differs from unit-to-unit, but in fact such notice is usually provided, in one form or another.

23. If no employee actually working in a seniority subdivision seeks to fill a job vacancy occurring in that unit, employees who have previously been laid off from that subdivision are recalled on the basis of subdivisional seniority. Thus, employees retain "recall rights" to jobs in units from which they have been laid off or have transferred, but they may only exercise such rights if no employee actually working in that unit desires to fill the vacancy.

24. If a job vacancy cannot be filled from among employees actually working in the unit, or from employees exercising recall rights to the unit, employees working anywhere in the plant may transfer to the vacant position; assuming ability and physical fitness are relatively equal, company seniority governs the selection.

25. Before August 1, 1971, there was no plant-wide posting or any other formal notice of job vacancies not filled from within the unit or by the exercise of recall rights. Employees interested in transferring to a different subdivision were permitted to file with the Employment Department forms, known as "request for transfer" forms, on which they designated their job preference. Vacancies which could not be filled from within the unit or through recall rights were supposed to be filled by the employment office by selecting the qualified employee with the most company seniority who had a request for transfer form to that unit on file.

26. Since August 1971, the collective bargaining agreements have required that notices of job vacancies which could not be filled from within the unit or through recall rights were to be posted at the various clock stations throughout the plant. Employees desiring to apply for the vacancy sign their names on a list maintained by the Employment Department. If they sign

the list within the time period specified in the notice, they are entitled to consideration on the basis of their company seniority. If they sign up after the deadline (below the "red line"), they are eligible for consideration on the basis of their company seniority, but only if the vacancy cannot be filled from among those whose applications were timely.

27. Under the various collective bargaining agreements, seniority (whether company or subdivisional) is the deciding factor in determining who receives a vacant job only when ability and physical fitness are relatively equal. Both before and after June 14, 1967, the company has used a variety of tests to determine eligibility for various hourly jobs, and has also based eligibility on an employee's disciplinary record with the company, and his supervisory evaluations.

28. Layoffs within a seniority subdivision are governed by subdivisional seniority, the least senior employee being laid off first. If an employee is laid off from one seniority subdivision but has previously worked in another subdivision, he may "bump" any employee in the other subdivision who has less subdivisional seniority in that unit. If an employee laid off from a subdivision is unable to "bump" into another subdivision, he may replace any employee holding a pool job who has less company seniority.

29. The foregoing procedures concerning transfers, promotions and layoffs have been in effect since the early 1940s, except that the rules governing "pool" jobs were instituted in 1962, and the rules governing plant-wide posting of job vacancies were instituted in August 1971.

B. *Salaried Work Force*

30. The salaried employees at Lukens range from operating management and professional personnel to plant guards and janitors.

31. Managerial positions are arranged in the following hierarchy of jobs, from the highest level to the lowest:

Officers (approximately 11 to 13)

Managers (approximately 23 to 26)
Superintendents (approximately 30)
Supervisors (approximately 40)
General foremen (approximately 60)
Foremen (approximately 300)

32. The first step in filling a salaried vacancy is the issuance of a requisition by supervisory personnel in the area where the vacancy exists. This requisition must then be approved by the Lukens' Salary Committee. If approved, the requisition is next sent to Employment Department personnel, who attempt to find a candidate to fill the vacancy, although the supervisory employees in the area where the vacancy exists may suggest a candidate or candidates. No formal notice of salaried job vacancies is given to Lukens' employees.

33. The Employment Department has used a variety of tests in selecting eligible candidates for salaried jobs, and also considers such matters as work experience, skill and knowledge, education, personality, temperament, and company service. There are no written guidelines. In all instances, the ultimate selection of a candidate to fill the vacancy rests within the discretion of supervisory personnel in the area where the vacancy occurs. The process of filling salaried vacancies has remained essentially the same since at least 1954.

III-A. INTRODUCTION TO FINDINGS ON THE MERITS

It is of particular importance in this case, in assessing the implications of the statistical and other "pattern or practice" evidence, to bear in mind the particular characteristics of the Lukens operation. The specialty steel industry involves the application of skills which are unique to the specialized manufacturing process in question. This is not a situation in which trade or craft skills found in the general work force, or acquired in other types of industry, are readily adaptable to Lukens' needs (with certain limited exceptions, such as welding, truck-driving, and some rough carpentry). The vast majority of the Lukens hourly work force start from scratch, and

are trained on the job. Indeed, Lukens has always prided itself upon its general policy of promoting from within.

By the same token, since most hourly employees commence their service with the company at the bottom of a career ladder, as laborers of some kind, there are no threshold educational or experiential requirements: physical health and amenability to training are the essential qualifications.

As an abstract proposition, therefore, it would be permissible to conclude that, if there is not and never has been racial discrimination at Lukens, there should be no substantial disparity between black and white employees in terms of job classifications, base wages, earnings and working conditions. That is, while the abilities, interests and motivations of individual employees undoubtedly differ, there is no reason to assume that such differences significantly favor either racial group.

There are, however, very substantial disparities between black and white employees of Lukens, in each of the various matters mentioned above. Moreover, it is abundantly clear that, in the past, blacks at Lukens (as, unfortunately, in many other industrial establishments) were discriminated against. They were permitted to work only in certain operating units (performing the least desirable kinds of work, generally speaking); had fewer opportunities for advancement, and therefore tended to be clustered in the lower job classifications; and were more likely to suffer disciplinary sanctions. In addition, they were exposed to a wide range of racial harassments. Locker rooms and rest rooms were segregated; racial animosity was openly expressed, orally, in writing, and by deed; and they were in general treated as second-class citizens. Throughout the 1930s, '40s and '50s and beyond, the personnel records maintained by Lukens for each employee contained a space for "nationality"; white employees were listed as "American," black employees were listed as "colored" or "Negro". In 1969, responsible Lukens officials issued orders for the correction of all personnel records by eliminating the offensive "nationality" designations; in a great many instances, this was accomplished merely by writing out the words "colored" or "Negro" with the result that, whereas white employees are listed as "American," many black employees are not accorded that designation.

In short, it is obvious from the evidence that, throughout the limitations period, any statistical racial analysis of the Lukens work force would be skewed because of earlier discrimination. That fact has placed each of the parties in a somewhat anomalous position. On the issue of intentional discrimination under § 1981, and on the bona fides of the seniority system under Title VII, it is to plaintiffs' advantage to emphasize the pre-limitations discrimination, both for the purpose of showing that discriminatory animus tainted the establishment of the seniority system, and for the purpose of showing that discriminatory animus carried over into the limitations period. But that same evidence renders plaintiffs' statistical proofs applicable to the limitations periods much more difficult, since it tends to provide a non-actionable explanation for many of the observed disparities. Needless to say, Lukens' problem is the mirror-image of plaintiffs': explaining present-day disparities as attributable to past discriminatory practices tends to undermine the company's § 1981 and seniority defenses. The union defendants, also, have been placed in the somewhat ambivalent position of minimizing the extent of earlier discrimination so as to bolster their contention that the seniority system was and is bona fide; for the most part, supporting the employer in its defense against claims being asserted by the unions' own members; and, at the same time, maintaining that all claims of racial discrimination were recognized and vigorously pursued.

Thus, it is not surprising that the evidentiary record as a whole reflects a good deal of legal tightrope-walking by all parties, and some seeming internal inconsistencies in their respective positions. The question before the Court, however, is not whether

one party or the other achieved a greater degree of success in solving its tactical and strategic problems, but what factual conclusions are correctly to be drawn from the mass of evidence presented.

In the following Findings of Fact addressing the merits of the various discrimination claims, matters as to which plaintiffs' proofs clearly fail to make out a prima facie case, and matters as to which there can be no substantial disagreement, will be set forth in summary form, without elaboration. As appropriate, particular findings or groups of findings will be accompanied by a discussion of the pertinent evidence, and the court's reasoning.

## IV. THE BONA FIDE NATURE OF THE SENIORITY SYSTEM

34. The seniority system embodied in the series of collective bargaining agreements governing the relationships between Lukens and its employees since 1937 have had, and continue to have, the inevitable effect of perpetuating disparities and disadvantages associated with race.

35. When the seniority system was established, blacks at Lukens were being, and had been for many years, discriminated against. In comparison to white employees, blacks occupied the lowest-paying jobs, were segregated into specific units, did not have equal access to promotional and transfer opportunities, etc.

36. Both the unions and the company were fully aware of the discriminatory practices and disparate status based on race. And both the unions and the company were aware that the seniority provisions of the initial and subsequent collective bargaining agreements would tend to stabilize and perpetuate the existing racial disparities.

37. In instituting the seniority system, however, neither the unions nor the company was motivated by racial considerations. The system of unit-seniority was adopted because it represented standard practice throughout the steel industry, and was assumed to be best suited to operating efficiency. From the standpoint of the unions,

the crucial first step and transcendent goal was to organize the workers and achieve recognition, and it was important to establish that this goal could be achieved with minimal alteration of the status quo. The company, too, sought to minimize change.

38. The 1962 modification of the seniority system through the establishment of the "pool" arrangement was not racially motivated. Moreover, the change did not disadvantage black employees; and blacks actively participated in the negotiations which led to the modification.

39. Pursuant to a 1974 Consent Decree in litigation brought by the Justice Department to remedy perceived racial discrimination in the steel industry, the major steel producers were required to, and did, implement plant-wide seniority. Although the labor negotiations of these major steel producers have been, and are, generally relied upon as establishing the pattern for the entire industry, no such change was implemented at Lukens. The International Union, while it announced the contents and ramifications of the Consent Decree in union publications available to the membership at large, made no concerted effort to discuss the Decree with the leaders of the local unions at Lukens, nor did it urge that plant-wide seniority should be adopted at Lukens pursuant to "pattern-bargaining". The company was not a defendant in the government litigation, and, so far as the record discloses, more or less ignored the implications of the Consent Decree.

It would be permissible to draw the inference that neither the company nor the local unions at Lukens were sympathetic to the Consent Decree or to the 'governmental interference' which produced it. But whether the bargainers at Lukens be deemed enlightened or benighted, the evidence as a whole makes it clear beyond dispute (a) that a shift to company-wide or plant-wide seniority would be as likely to disadvantage blacks as to improve their lot; (b) among all Lukens employees, black and white alike, there is and has always been an overwhelming preference for the

present seniority system, over a plant-wide system; (c) blacks participated actively in the negotiations leading to each of the pertinent collective bargaining agreements, and never suggested any such change in the seniority system; and (d) among the 50 or so witnesses who testified for the plaintiffs in this case, not one expressed any complaint about the seniority system.

40. Even if the seniority system at Lukens had been established for the express purpose of perpetuating racial disparities (which, as noted above, is not the case), a shift to plant-wide or some other seniority system would be unlikely to provide any net benefit to black employees, now or in the future.

## V. RACIAL DISPARITIES ATTRIBUTABLE TO IMPACTS OF THE SENIORITY SYSTEM, AND THEREFORE NOT ACTIONABLE

41. The evidence establishes the following facts, but, because attributable to the impacts of a bona fide seniority system, these facts provide no basis for relief in this case, and the evidence in support of these facts has little or no probative value in this case:

(a) that white employees as a group receive higher hourly adjusted base wages than comparable black employees;

(b) that white employees receive higher overall annual earnings than comparable black employees;

(c) that white employees are in higher job classes than black employees of equal company service (both treating the hourly work force as a whole, and also treating craft and non-craft employees as separate groups);

(d) that white employees hold a disproportionately high percentage of craft jobs, compared to their representation in the non-craft hourly work force.

Plaintiffs have presented other evidence pertaining to racial disparities, unrelated to seniority and not shown to have been affected by the seniority system, which must now be considered.

## VI. INITIAL JOB ASSIGNMENTS DURING THE LIMITATIONS PERIOD

### A. *The Job-Class of Initial Positions*

42. White employees hired between January 1, 1972 and February 7, 1977, into non-craft jobs were initially assigned to positions with an average job class of 4.9. During the same period, blacks hired into non-craft jobs were initially assigned to positions with an average job class of 4.42. This difference of almost one-half a job class is statistically significant at the .01 level (more than five standard deviations from the result which would be expected in the absence of racial impact).

43. Hiring at Lukens is conducted on a weekly basis, and the choice of initial assignment necessarily reflects the particular openings available in a given week.

44. During the same January 1, 1972 to February 2, 1977 period, treating each week's hires separately, it appears that the median job class in most weeks was class 5. Indeed, during the entire period, more than half of white non-pool hires, and almost 70% of black non-pool hires, were assigned to positions in job class 5. The likelihood of a black new hire achieving initial placement above job class 5 was much less than the likelihood of a white hire obtaining such a placement (more than six standard deviations less likely, a difference which is statistically significant to a high degree). (Lukens' table L–27.)

45. Another study, covering the years 1973–77, establishes that the initial placements of non-craft new hires into job classes, on average, was 5.0 for white males, 4.8 for white females, 4.7 for black males, and 4.2 for black females.

46. Reverting to table L–27, covering the period January 1, 1972 through February 2, 1977, it appears that there were 25 weeks in which the median job class of new hires was higher than class 5. More whites than blacks were hired in 18 of those weeks (72%).

B. *Initial Assignments to the Pool Versus Initial Assignments to Seniority Subdivisions*

47. There are three potential advantages which tend to make initial assignment to a seniority subdivision preferable to initial assignment to the pool:

(a) First, an employee initially assigned to a seniority subdivision begins to accumulate seniority in that subdivision, as well as company seniority. So long as he remains in that subdivision, he will always have rights to jobs in that subdivision which will be superior to the rights of other persons hired the same day but initially assigned to the pool. If he later transfers out of that subdivision, his accumulated seniority may enable him to bump back into that subdivision in the event of a layoff in his second subdivision. Thus, an employee initially assigned to a seniority subdivision gains added protection against layoffs.

(b) Second, in the event of layoff, a pool employee's job rights are subordinate to those of every hourly employee with an earlier company service date. The job-rights of an employee in a seniority subdivision, however, are junior only to persons having more seniority in that subdivision. Thus, if a layoff does not hit that particular subdivision, the subdivision employees will continue to work even though other employees with greater company seniority are being laid off.

(c) Third, an employee in a seniority subdivision enjoys greater stability and certainty in work-assignment. Pool employees, on the other hand, are subject to being transferred from job to job on a daily, or even hourly, basis.

48. During the period January 1, 1972 through February 2, 1977, of persons described as "new hires" in Lukens' transaction reports, black employees had a 23.5% greater likelihood than whites of being assigned initially to the pool. 31.8% of black new hires were assigned to pool positions, compared to 24.2% of white new hires. This disparity is statistically significant to a high degree (at the .01 level).

Apparently, Lukens' records list as "new hires" many persons who were employed at Lukens previously, and are being re-hired; and Lukens contends that it is reasonable to assume that a person being re-hired is likely to be assigned to the same type of job previously held. I have some difficulty appreciating the significance of this argument, at least in the absence of a showing that such transactions affecting blacks were recorded or labeled differently from similar transactions involving whites; or that blacks are more likely to be re-hired than are whites. Moreover, there is reason to doubt the initial premise, namely, that jobs assignment on re-hire is likely to be similar to the job assignment on initial hire. A study by plaintiffs' statistical expert demonstrates that there is no correlation between the job assignment on initial hiring and the job assignment on most recent re-hire. (N.T. 31.86–87; U–461.)

Be that as it may, elimination of all "new hire" transactions which Lukens contends are repetitious (approximately 27% of the total "new hire" transactions reflected in Lukens' records) merely reduces the disparity between races, but does not neutralize it.

49. Considering only the "new hires" asserted by Lukens to be genuine "new hires," 26.3% of blacks were assigned to pool jobs, as compared with 21.6% of whites. This disparity is statistically significant (at the .02 level).

50. Analyzing repeat-hires separately produces the following: Of "second" hires, 44.3% of blacks and 30.3% of whites were assigned to pool positions. Of all repeat hires, 46.8% of blacks and 31.1% of whites were assigned to pool positions.

On their face, these percentages show statistically significant disparities to a high degree (at the .01 level). As independent evidence of discrimination, however, the importance of these "re-hire" figures is relatively slight. Employees in pool jobs are more likely to be laid off than employees in seniority units, hence (probably) more likely to experience repeated hirings. Blacks have always been over-represented in the

pool. The "pool" jobs are those at the lowest end of the ladder. Absenteeism, voluntary quits, and adverse disciplinary actions—all of which tend to burden blacks more than whites, as will be discussed later—may contribute to the "re-hire" assignment disparities.

51. There is no statistically significant racial disparity in pool versus non-pool assignments among "new hires" for the 1969–1970 period (Lukens' table L–75). When all "new hires" regarded by Lukens as genuinely "new" hires, for the entire period from 1969 through 1977 are studied (*i.e.*, combining the data in Lukens' table L–75 with the data in Lukens' table L–76), it appears that 30.9% of blacks were assigned to pool positions (200 of a total of 646) while only 26% of whites were assigned to pool positions (355 of a total of 1,336). These disparities are statistically significant (below the .05 level).

52. Lukens contends, *inter alia*, that the foregoing statistics are irrelevant, and that the only relevant statistics are those which analyze the hiring process week-by-week. It is true that, in weeks during which both blacks and whites were hired, and one or more new hires were assigned to the pool, there was no significant racial disparity in pool assignments. I find this argument unpersuasive.

While Lukens does hire on a weekly cycle, and the initial job assignments reflect the kinds of openings available in a particular week, I am persuaded that the overall statistics provide a more reliable racial comparison than do the weekly statistics. Just which positions will be filled, and when, is entirely within the control of the company. Although theoretically job applications are kept on file in the employment office in chronological order so that applicants can be interviewed in chronological order for available openings, this is not a rigid rule, and is commonly departed from. The entire process, of deciding when various positions are to be filled, and who will fill them, involves many subjective judgments by managerial personnel.

Analysis of the overall statistics shows that blacks, to a statistically significant degree, are more likely than whites to be newly hired and initially placed in weeks in which large numbers are assigned to pool openings. The probability of this occurring by chance are about 3 in 10,000, more than 3 standard deviations (P–1390; N.T. 30.98–100).

There are, to be sure, data tending to negative discrimination in initial job assignments. Defendants properly point out that, in weeks in which no pool jobs were filled, a higher percentage of blacks than whites were hired; and that in weeks where no blacks were hired, a greater percentage of pool positions were filled than in weeks in which blacks were hired. (Lukens' Exhibits L–1901B and 1902A.) In my view, however, the overall statistics carry greater weight. Analysis of each hiring week separately is suspect because of the smaller numbers involved; such minute analyses may often be meaningless. Moreover, plaintiffs are not required to prove that discrimination occurred every week, or that the employer invariably discriminated.

53. Lukens has also attempted to refute the foregoing statistics on the theory that gender differences (not actionable here) rather than racial differences, are reflected in the data. Lukens personnel involved in the hiring process testified that, based on their observations, women seeking employment at Lukens tend to prefer pool assignments, because such jobs are less demanding, tend to fit in better with the flexible schedules desired by housewives with families to care for, and are better suited to the needs of persons whose primary careers are in the home.

One such witness was George P. Kissell, Jr. However, during the time he was in charge of the placement of hourly employees (February 1974 through July 1976) a higher percentage of male applicants were assigned to pool positions (19.1% of male new hires) than female (18.7% of female new hires) (L–25, 26). No detailed statistics were presented covering the period when Trinka Fleming, the other witness

who noted the alleged preference of females for pool assignments, was in charge of the process. During the entire period of Kissell's and Fleming's tenure, only 43 females were newly hired to non-craft positions.

During the period from July 19, 1973 through February 23, 1974, according to an internal report prepared by Lukens' record administrator, Carl Welsh, among female "new hires" 48% of the blacks were assigned to pool positions, as compared with only 27% of the whites.

At trial, Lukens presented other statistics (allegedly reflecting elimination of repeat hires), showing that, among female new hires, 39% of the blacks were assigned to pool positions, as compared with 24% of the whites.

Even assuming (contrary to the plain implications of Lukens' records) that the alleged preference among women for pool assignments did exist, it does not explain the racial disparities, either in the aggregate, or among male new hires, or among female new hires. That is, there is no suggestion that the alleged preference for pool jobs was more prevalent among black females than white females.

## C. *Access to Better-Paying Hourly (Craft) Positions*

54. As noted above, blacks are significantly under-represented in craft jobs at Lukens. But since this is, in substantial part at least, attributable to pre-limitations activity and the impact of the bona fide seniority system, the gross statistics (percentages in various categories, wage and earnings levels, etc.) are not particularly helpful. There is, however, other evidence which bears directly on the issue of whether or not, during the limitations period, blacks were discriminated against in respect of the accessibility of craft jobs.

55. Of the employees first hired at Lukens, into non-craft positions, between January 1, 1972 and February 2, 1977, 4.8% of the black hires had been promoted into craft positions by February 2, 1977, whereas 14.9% of the white new hires had been

promoted to craft positions within that period. Thus, whites employed during that period were more than three times as likely as blacks to be promoted into craft positions.

56. During the same period, 34.4% of all "new hires" were black, whereas only 14.5% of those new hires who were promoted to craft positions were black (this represents about 6.62 standard deviations from the random).

57. The foregoing findings are applicable, whether "craft positions" are defined pursuant to the pre-1971 "industry" definition, or the post-1971 "EEO" definition.

58. As demonstrated in P–501, p. 2, P–502, table 3, and as testified (N.T. 4.12–14), although company seniority has a bearing on eligibility for promotion to craft positions, seniority does not account for the disparities mentioned above. A comparison of all hourly employees actively employed at Lukens as of February 2, 1977, by year of hire, shows that, in 33 of the 34 years studied, blacks hired during that year were, to a statistically significant degree, less likely to have achieved craft status by February 2, 1977 than their white counterparts. Indeed, the defendants concede that the racial disparities in craft positions are not accounted for by seniority.

59. Since 1962, the collective bargaining agreements have mandated that, where ability and physical fitness are substantially equal, transfers to better jobs are governed entirely by company seniority. However, the "request for transfer" system which was in operation until August 1971, and, to a lesser extent, the "posting" system which has pertained since that date, were susceptible to abuse on racial grounds. As noted previously, until the 1971 job-posting program was instituted, the existence of openings in craft positions was likely to become known only to a few persons, who could then selectively impart that information to their friends and relatives. While precise statistical or documentary evidence is not available on this subject, the evidence as a whole leaves little doubt that, before August 1971, blacks

were much less likely to learn of the availability of craft openings than their white counterparts.

Moreover, actual approval of job-transfer requests involved a great many subjective judgments on the part of supervisors. Until 1971, the supervisor of the subdivision into which transfer was sought had absolute and unfettered discretion to approve or reject a transfer application. Until August 1971, a transfer request could, and usually was, "voided" in the employment office (*i.e.*, was not even submitted to the supervisor of the subdivision in question) if the employee seeking transfer had not maintained a "clean" disciplinary record for the previous three years. Absenteeism, as such, was disregarded, unless the employee had been disciplined for absenteeism. As discussed below, blacks were much more likely to be disciplined for absenteeism (and in general) than their white counterparts.

60. At least during the pre-limitations period, there were numerous instances in which transfer requests were denied expressly because of racial considerations. There is no evidence of any specific instances of overt racial discrimination in the transfer process during the Title VII limitations period, and only a few such instances during the § 1981 limitations period were testified to (these will be considered in connection with the individual claims of named or intervening plaintiffs).

On the other hand, some of the same individuals who had been guilty of overt discrimination during the pre-limitations period continued to have and exercise decision-making authority during the limitations period. That fact, coupled with Lukens' unremitting contention that there has never been any racial discrimination at Lukens, lends some support to the inference that the job-transfer system may have been manipulated, during the limitations period, to achieve racial discrimination in access to craft positions.

### D. *Manning New Facilities; Strand-Casting*

61. In 1969, Lukens decided to construct a Strand-Cast facility. Strand-casting was then a relatively new process, in which molten metal is poured directly into a cast slab (rather than into molded ingots which are thereafter converted into slabs). It was contemplated that this new process would largely replace the work then being performed in the open hearth pits, hot top, and conditioning steel yard subdivisions.

62. The applicable collective bargaining agreements provided that employees displaced from "any facility being replaced" by a new facility were to be given preference for entry into the new facility, in the order of their company seniority (union Exhibit U–481A).

63. The subdivisions most directly and drastically affected by the introduction of the strand-casting process were the pits, hot top, and conditioning steel yards. Seventy-percent of the hourly employees in those subdivisions were black. Plaintiffs contend that employees in those units should have been given precedence in manning the new facility and that, if this course had been followed, the new strand-casting seniority unit should have been approximately 70% black.

The company, however, determined that several other seniority subdivisions would have their manpower requirements reduced as a result of the new facility. These included the melting floor, cranes, 140/206 heating, 206 rolling, 206 floor and stock yard units; membership in most of these units was predominately white. Accordingly, the company interpreted the collective bargaining agreement as requiring it to accord priority to employees in all of the units mentioned above, in the staffing of the new Strand-Casting Unit.

There were 720 employees potentially eligible for assignment to the new Strand-Cast Unit, as determined pursuant to the company's interpretation of the collective bargaining agreement. Of these, 106 completed the application process. Thirty-one were ultimately selected; of these, 14 (47%) were black. Eight of the 14 blacks selected (60%) came from units other than pits,

hot top and steel yards (Lukens Exhs. L–955, L–956).

64. While there is much force to plaintiffs' argument that, since the disproportionately black units were most drastically and directly affected by the implementation of the new manufacturing process, employees in those units were entitled to the lion's share of the new jobs in Strand-Casting, the company's interpretation of the collective bargaining agreement is not manifestly unreasonable.

■■ Because of the newness of the strand-casting method, the high cost of the equipment used in that process, and the potentially disastrous effects of employee error in conducting the operations, Lukens was understandably interested, to an unusual degree, in assigning the best-qualified persons to the new unit. While I recognize the distinct possibility that the decision-makers may have been influenced by racial stereotyping, unconsciously or otherwise, in deciding to open the application process to units less directly affected by the new facility, and while that possibility is obviously a disturbing one, I am unable to conclude that the evidence preponderates in favor of a finding of racial animus in this situation. That a genuine business judgment was made cannot be doubted; and, while this business judgment may have been clouded by racial preconceptions, I cannot find, from the evidence, that this is more likely true than not. It must be remembered that 47% of the persons assigned to the new unit were black, and that more than half of those blacks came from units which, according to plaintiffs' argument, were improperly included in the opportunity because predominately white.

65. Persons assigned to the Strand-Cast Unit were selected on the basis of company seniority and their ratings by supervisors, on a form known as the Personnel Description Check List ("PDCL"). The PDCL ratings were entirely subjective; most of the raters were white; and, when studied later (in 1972), the PDCL proved to have had a statistically significant adverse impact upon blacks.

66. Named plaintiff Ramon Middleton was initially rejected for the Strand-Cast Unit, solely because of his PDCL rating, which had been performed by a supervisor named Matthews. According to Matthews, who is white, only two persons evaluated by him were given unsatisfactory ratings on the PDCL; they were Middleton, who is black, and George Eachus, who is white. This testimony lends significant support to plaintiffs' contention that Middleton was discriminated against. The employment records of the two men show that Middleton's disciplinary record, over a 14-year period, consisted of 2 warnings, the most recent of which occurred in 1967. Eachus, on the other hand, had been twice suspended and had received four warnings, all between December 1969 and April 1971 (Exh. P–1421).

67. Four of the selected employees began training for the Strand-Cast Unit on July 20, 1970, 12 more began training on August 3, 1970, and eight more were added to the training program as of January 4, 1971. Middleton was less senior than the selectees in the first two groups, but the group which began training in January 1971 included two employees who had less company seniority than Middleton. It was then that Middleton learned, for the first time, that he had been rejected.

As a result of Middleton's protest, the union filed a grievance on behalf of Middleton and other rejected applicants, challenging the procedures for selection, including specifically the PDCL. Eventually the company and the union, with the approval of the affected employees, worked out a compromise solution pursuant to which specified employees, including Middleton, were to be given "special consideration" for assignment to the Strand-Cast Unit. This arrangement was agreed upon as of February 3, 1971. On March 9, 1971, with the cooperation of the union representative, Middleton filed a complaint against the company with the Pennsylvania Human Relations Commission.

On April 5, 1971, eight additional employees were added to the Strand-Cast Unit, Middleton among them.

The net result of this series of events is that Ramon Middleton, by virtue of a foreman's evaluation which probably was tainted by racial bias, was not assigned to the Strand-Cast Unit as early as he should have been. He is, I believe, entitled to adjustment of his seniority in that unit.

68. The most important job in the Strand-Cast Unit—indeed, it is the highest hourly job in the entire plant—is that of "No. 1 operator". The company decided that persons to be trained for the "No. 1 operator" position should, as a prerequisite, have at least two years "hot metal" experience, and specified the various jobs throughout the plant which, in the company's view, provided such experience. The "hot metal" requirement, as thus limited, excluded a disproportionately high number of blacks from consideration for the No. 1 operator job.

In retrospect, it seems quite probable that experience in several other jobs, in addition to those specified by Lukens, would have rendered an employee fully as well qualified for the No. 1 operator job as the experience mandated by Lukens, but that is not a judgment for this court, or the plaintiffs, to make. There can be no doubt that, in establishing these criteria, Lukens' officials were making honest business judgments. I am satisfied that racial considerations did not enter into the selection of these criteria.

At any rate, it is conceded that, if the "hot metals" experience requirement had been deleted, and the selections based entirely upon seniority, the four positions would have gone to whites anyway.

By the time of trial, one of the four top jobs in the Strand-Cast Subdivision was held by a black, and other blacks were being trained for the position. Viewed in its entirety, the evidence does not establish that there was racial discrimination in promotions to the "No. 1 operator" positions.

E. *Lukens' Explanation and Refutation; Superior Qualifications and personal choice*

69. As noted above, most craft positions at Lukens involve skills which must be learned during employment at Lukens. With limited exceptions, the principal requirements for promotion to a craft job are: physical ability to handle the job, amenability to instruction, and a desire to attain that position. Given those pre-requisites, company seniority is determinative.

70. Lukens challenges the probative force the statistical disparities discussed above on the ground that the statistical evidence does not address two important factors: personal choice, and relative qualifications.

71. While there may be, and undoubtedly are, isolated instances in which an eligible employee chooses to reject an offered promotion, or chooses not to apply for a better job, for personal reasons, there is no evidence, and I am unwilling to assume, that blacks are less interested in advancement than their white counterparts. It is, I believe, a safe generalization that most persons are interested in advancing their own economic welfare whenever the opportunity presents itself. I therefore reject the suggestion that personal choice contributes significantly to an explanation of the racial disparities disclosed by the statistical evidence. Moreover, it should be noted that if one were to conclude that a significantly greater percentage of blacks than whites choose not to improve their lot and that this phenomenon occurred on a sufficient scale to affect the interpretation of the statistical evidence, one might well then be faced with addressing the possible causes of such a phenomenon. If, for example, blacks tended to refuse promotion because of a sense, derived from the atmosphere of the work place, that they would not be welcome in the new position, or would be expected to "prove themselves" and overcome skepticism, or would thus become vulnerable to additional forms of discrimination, the alleged personal choice phenome-

non would scarcely constitute a valid explanation of the statistical evidence.

72. There is no evidence that, among persons initially hired at Lukens, blacks as a group were less qualified than whites for advancement to craft positions or to salaried positions.

73. To the extent that Lukens relies upon evidence concerning the under-representation of blacks among skilled craftsmen in the local outside labor market, the reliance is misplaced. Lukens was hiring persons capable of developing required skills, not persons who already possessed such skills. There is no evidence that, among persons actually hired at Lukens, whites tended to possess relevant skills to a greater degree than blacks.

74. The evidence concerning employee-testing programs at Lukens, detailed below, strongly supports plaintiffs' claims of discriminatory treatment.

(a) Until at least 1971, Lukens relied heavily upon the Wonderlic Test as a device for determining eligibility for advancement to craft positions, and to higher job classifications. In order to be eligible for advancement to a craft job, an employee was required to achieve a certain grade on the Wonderlic Test. In general, higher scores were required for each advancement to a higher job classification.

(b) It has been generally known since the late 1940s, and was in fact known to the pertinent officials at Lukens, that the Wonderlic Test is a measure of formal education, rather than of intelligence.

(c) As early as 1952, Lukens officials were aware, not only that the Wonderlic Test tended to measure formal education rather than intelligence, but also that the test was not job-related; indeed, that there tended to be a negative correlation between scores on the Wonderlic Test and actual job performance, as measured by supervisors' ratings (Ex. P-8).

(d) In 1964, a Lukens official, James Hall, conducted a study to determine whether there was any relationship between Wonderlic Test scores and job-performance in the Lukens crane-operator training program. The study demonstrated that the Wonderlic Test was useless as a predictor of success as a crane-operator. The study even produced some evidence of an inverse relationship between test scores and job performance.

(e) On October 16, 1967, an employee of the Lukens Employment Department sent a memorandum to James Hall advising that, pursuant to federal and state testing guidelines, it was necessary that each item on the Wonderlic Test be compared to specific job content. No action was taken in response.

(f) The same memorandum also suggested the desirability of a validation study of the Wonderlic cutoff scores. So far as the record discloses, no such study was made.

(g) In 1968, Mr. Hall, because of his realization that the Wonderlic Test tended to have an adverse impact upon minority employees, directed that a study be conducted in an attempt to measure the relationship between Wonderlic scores and five selected criteria of successful job performance. The study was completed in August 1968, and established that the Wonderlic was "extremely poor" in predicting job performance (Exs. P-27, 28).

(h) At least by June 1967, it was generally known among Lukens officials that the Wonderlic Test had an adverse impact upon blacks, and that its use was a major reason for the observed concentration of blacks in the lower job classifications at Lukens.

(i) Some Lukens witnesses testified that Lukens stopped using the Wonderlic Test as a screening device at or about the time the Supreme Court rendered its decision in *Griggs v. Duke Power Co.*, in March 1971. However, other Lukens witnesses testified that the abandonment of the Wonderlic Test for screening purposes occurred at the same time with respect to all positions, and it appears that the Wonderlic Test was being used for screening applicants for the position of foreman as late as July 1974. No written directive concerning abandon-

ment of the Wonderlic device appears ever to have been issued.

(j) In July 1971, a directive was issued (by Mr. Domangue) to the effect that all tests currently in use at Lukens would continue to be used until a superior substitute had been developed, validated and instituted. To date, no testing procedure or screening device employed by Lukens has been validated.

(k) Some Lukens witnesses testified that, at some point between 1968 and 1971, Lukens began using the SRA Non-Verbal Test in place of the Wonderlic, on the theory that this would overcome the racially disparate impact of the Wonderlic test. However, the Lukens employees who actually administered such tests testified that the SRA Non-Verbal Test was rarely used, and that its use decreased between 1968 and 1971.

(l) Although Lukens stopped administering the Wonderlic Test (probably some time in 1971), Wonderlic Test scores continued to be shown under "qualifications" on job transfer forms after that date.

(m) In 1972, Lukens developed a test known as the "Shop Math Test" which it required for entry into electrical craft positions. By 1974, the Shop Math Test was also required for entry into the Mechanical Maintenance Subdivision, and at some point thereafter it became a requirement for entry into virtually all of Lukens' trade and craft subdivisions (P–43, P–49).

(n) The Shop Math Test was frequently revised, and it is impossible to determine which version may have been employed at particular times.

(o) Lukens presented data suggesting that, between 1974 and September 22, 1978, the Shop Math Test was administered to 479 white employees and 93 minority employees. Sixty percent of the whites passed, compared with twenty-nine percent of the blacks. These figures lead inescapably to the conclusion that the Shop Math Test was a substantial factor in producing the racially disparate rate of transfers from non-craft to craft jobs discussed above.

(p) Neither the Shop Math Test, nor any other screening device employed at any time at Lukens, has ever been validated as job-related. As is demonstrated by a series of internal memoranda from 1968 through 1979, responsible officials at Lukens were well aware that the various testing and screening devices had a disparate impact upon blacks, that they had not been validated as job-related, and that, in the absence of validation, their continued use was highly questionable.

(q) At the time of trial, Lukens purportedly was engaged in an attempt to validate the Shop Math Test, for content-validity.

(r) Throughout the period when the Wonderlic Test was in widespread use at Lukens, Lukens officials constantly defended the practice as being validly job-related, despite the fact that their own studies had shown the contrary. In the course of collective bargaining negotiations in 1968, when the union challenged the continued use of the Wonderlic Test, company representatives dismissed the challenge as being asserted merely on behalf of "minorities".

(s) Lukens did not preserve records of tests administered, or test scores in any systematic way. There is therefore no adequate basis for statistical studies demonstrating that particular tests did adversely affect racial minorities. On the other hand, it is reasonably clear that the Lukens personnel administering the Shop Math Test believed, on the basis of their observations, that the Shop Math Test did adversely affect minorities.

75. There is no evidence to suggest that there was any dissimilarity between the tests required of white applicants and the tests required of black applicants for promotion/transfer.

### F. *Shift Assignments, Incentive Bonuses, Overtime Pay*

76. Plaintiffs presented a great deal of anecdotal evidence tending to show that many foremen and supervisors dis-

criminate between races in assignments to particular work, overtime work, less desirable shifts, etc. There can be no doubt that many individual instances of discriminatory treatment have been shown. Considered as a whole, however, the evidence in this case is inconclusive with respect to plaintiffs' assertions that, customarily and on a class-wide basis, blacks were discriminated against with respect to shift assignments, Sunday work, and overtime pay. The statistical evidence tends to show that, on average, blacks at Lukens receive more overtime pay and incentive bonus compensation than their white counterparts. This may well be due to the fact (as asserted by plaintiffs) that blacks are more likely to be assigned to work on Sundays than are whites. Plaintiffs may be correct in arguing that most employees would prefer not to work on Sundays, hence assignment to Sunday work is a disadvantage. On the other hand, the defendants may well be correct in arguing that Sunday work, which produces higher pay than work during the week, is a much-desired benefit. The record provides no basis for choosing between these two interpretations.

77. There is, however, substantial support in the evidence for plaintiffs' charge that there was racial discrimination in the denial of an incentive-pay plan for workers in the open hearth pits.

When the open hearth furnaces were in operation (the changeover to electrical furnaces was completed at about the time this lawsuit was filed), two different seniority subdivisions were involved in the process. Workers in the melting floor (the "floor" workers) placed the raw materials into the furnaces for melting and supervised the melting process. These workers were physically located at a higher level than the pit workers. The pit workers prepared the molds to receive the molten metal, poured the molten metal into the molds, and removed the molds after the metal had hardened. The "floor" subdivision was historically predominately white; the "pit" subdivision was historically all black (even by 1978, it was 95% black).

As can be readily perceived, the quantity and quality of work produced in operating the open hearths was a measure of the performance of both seniority units, neither of which could function without the other, nor at a different rate than the other. Nevertheless, Lukens had an incentive-bonus plan for the floor workers, but not for the pit workers.

This differential was a source of great pride and amusement for the floor workers. There was testimony about incidents in which the floor workers would wave their pay checks at the pit workers below, and brag that their incentive pay was greater than the pit workers' total pay.

After many years of complaint and struggle, the pit workers, through the union, sought to obtain an incentive pay program for their unit. The company eventually agreed to provide an incentive pay arrangement for the pit workers, but only if they would give up a previously negotiated agreement concerning crew size in the pit unit. The pit workers were unwilling to yield on the crew-size issue, and no incentive pay plan was ever agreed upon. There were incentive-compensation plans for other units which had crew-size agreements as well, or at least informal arrangements concerning crew size which were observed by both sides.

78. At no time did the collective bargaining agreement provide for incentive-pay in the open hearth pit subdivision. The union sought to negotiate such an arrangement, but, as stated above, was ultimately unsuccessful. Given the fact that the company paid incentive bonuses to the "floor" personnel, however, the company's refusal to accord the same benefit to the pit personnel had no legitimate justification. I find that this was a clear instance of racial discrimination.

79. In matters of shift-differentials, overtime pay and work assignments, minority employees at Lukens had no greater entitlement than white employees, namely, the entitlements required by the collective bargaining agreements. Any employee whose rights under the collective bargain-

ing agreement may have been violated had the right to press a grievance; and the record leaves no doubt that the grievance mechanism was frequently and widely utilized. Unless there was racial imbalance or unequal treatment in the grievance proceedings, therefore (a topic which will be discussed later in this Opinion), it is reasonable to conclude that the individual claims of discrimination in these respects have been satisfactorily and properly resolved in the grievance proceedings. That is, such proceedings presumably remedied actual departures from collective bargaining agreement entitlements; and if no such departure was established in that proceeding, the probability is that there was no disparate treatment calling for a remedy in this litigation.

While the sheer volume of alleged individual incidents is somewhat disturbing, the fact remains that a great many of the alleged instances seem indistinguishable from the normal gripes which arise and irregularities which occur in any workforce regulated by collective bargaining. It is reasonable to suppose that a great many white employees, too, complained about shift-differentials, work assignments, and overtime compensation. As will be discussed below, analysis of the grievances which were filed during this period suggests that grievances were pursued on behalf of black employees at a rate approximately equal to their representation in the hourly work force. If roughly one-third of all grievances were pressed on behalf of blacks, as the evidence suggests, it would be reasonable to conclude that blacks and whites perceived violations of the collective bargaining agreement in these respects in approximately proportionate numbers.

For these reasons, I conclude that the evidence in this case provides no basis for granting class-wide relief with respect to matters of scheduling, shift-differentials or overtime compensation.

### G. *Discrimination in Discipline*

80. Whether perceived infractions would be noted in the employee's personnel file, whether discipline should be imposed, and the nature and extent of disciplinary action, were all matters primarily within the subjective discretion of individual foremen and supervisors. Most of the persons with decision-making authority in disciplinary matters were white.

81. An employee who left work before the end of his shift, and before his replacement had arrived, was subject to being logged for "early quit". An employee who arrived late was subject to being logged for "late start", and might (particularly if other arrangements had been made in the interim) be sent home, in which case he would be recorded as "absent". And, of course, an employee who failed to report for work, without having telephoned in advance or otherwise reported his unavailability sufficiently in advance of the scheduled starting time, would also be recorded as "absent".

82. Considered in its entirety, the evidence convinces me that a large number of foremen treated their white employees more leniently in these respects than they treated their black employees. This is not to say that blacks were logged for infractions of which they were not guilty. Although there may have been isolated and rare instances of totally unsupported disciplinary charges against blacks, I conclude that disciplinary charges actually logged and recorded against blacks should be regarded as establishing that the violation did in fact occur. Rather, my conclusion is that white employees in virtually identical circumstances were much less likely to have disciplinary charges brought or recorded against them.

I find it impossible to quantify this differential, but believe it appropriate to keep that differential in mind in analyzing the statistical evidence presented.

83. Black employees made up approximately 33% of the non-craft hourly work force during the period from September 25, 1972, to February 2, 1977. During that period, 56% of all non-craft employees discharged "for cause" were black (approxi-

mately 11.4 standard deviations above what would be expected if the discharge process had an equal probability of affecting blacks and whites).

84. Of the 403 total discharges during the above period, 348 occurred in the first three months of employment. The percentage of black employees discharged during their first three months of employment (56%) exceeded the percentage of new hires who were black (34.4%) by 8.5 standard deviations.

Without more, of course, these figures prove very little. That is, they show either that blacks were unsatisfactory employees, or that they were judged more harshly than whites; but it is impossible to tell which is the correct inference.

85. I accept as essentially correct Lukens' contention that there was in fact a valid reason for discharging every person who was discharged. But if the same "reason" relied upon to discharge a black employee did not result in the discharge of a white employee providing the same "reason," an inference of racial discrimination is plainly justified. Accordingly, it is important to try to achieve a comparison between the treatment accorded similarly situated blacks and whites.

86. Lukens maintained personnel records of every employee discharged for cause, containing notations as to the cause for discharge. In many instances, there is also available some further record, such as the minutes of a grievance committee meeting, which sheds light on the basis for the discharge decision.

87. In a very large percentage of discharge cases, excessive absenteeism was noted as a cause, or one of the causes, for the discharge.

88. Both sides have presented statistical studies attempting to determine whether blacks were more likely to be discharged than whites with similar disciplinary records for absenteeism. Plaintiffs' studies were based upon the personnel and other records supplied by Lukens. After plaintiffs' study (which showed significant

racial discrimination) was prepared, Lukens conducted further studies which suggested that, in many instances, the "reason" set forth in the personnel records ("absenteeism") was not correctly reported, thus undermining the validity of plaintiffs' studies.

While I remain persuaded, as I stated in the course of the trial, that plaintiffs should be entitled to rely upon Lukens' own records in this respect, I nevertheless recognize that it is often difficult to determine precisely what the real reason for a discharge decision may have been (absenteeism, plus some other relatively minor infraction which proved to be the last straw, or a fairly serious infraction coupled with an unsatisfactory record of attendance).

It does seem reasonable, in this context, to conclude that if absenteeism was expressly noted on Lukens' records as the cause or a principal cause for the discharge, the employee probably would not have been discharged if his attendance record had been better.

Moreover, Lukens contends that absenteeism, to some extent, was a factor in virtually all discharge decisions.

Accordingly, it is important to try to compare the absenteeism records of blacks and whites discharged for absenteeism, and the absenteeism records of all blacks and whites discharged for cause, as well as the absenteeism records of employees who were not discharged.

89. In my view, a very significant bit of evidence is plaintiffs' Exhibit P–1399A, a study which demonstrates that blacks were much more likely to be discharged for absenteeism than whites, unless the absenteeism rate exceeded 30%. Stated otherwise, among employees with the same percentage of absenteeism on their records, blacks were much more likely to be discharged for absenteeism than were whites.

90. Accepting as correct Lukens' contention that some of the "reasons" for discharge were erroneously reported or interpreted, and accepting Lukens' interpretations as the correct ones, does not substan-

tially affect the probative force of Exhibit P–1399A.

91. The data reflected in Exhibit P–1399A include all discharges, irrespective of whether the discharge occurred during the probationary period or thereafter. In the circumstances of this case, the failure to analyze probationary and non-probationary discharges separately does not weaken the probative force of the exhibit nor the conclusions flowing therefrom, namely, that, unless a worker is absent more than one-third of the time, he or she is much more likely to be discharged for absenteeism if black than if white.

Lukens' own evidence (L–2414, 2416) establishes that, among persons discharged during the probationary period, blacks had better attendance records than whites. Moreover, the percentage of blacks discharged during the probationary period for reasons other than absenteeism (*i.e.*, where absenteeism is not mentioned as a cause) was higher than the percentage of blacks among discharges related to absenteeism.

92. As noted above, there is necessarily some lack of precision in assigning "reasons" for discharge decisions. Indeed, it is probable that quite a few errors crept into the Lukens records; many persons initially listed as having been "discharged" might, with equal accuracy, have been described as "voluntary quit". Lukens' original records (*i.e.*, those kept contemporaneously, in the normal course of business) showed 414 employees as having been "discharged for cause" between April 16, 1971 and February 2, 1977 (L–2415). Lukens' witnesses testified at trial, however, that only 341 of those persons were actually discharged. While Lukens' post-trial submissions are not entirely clear on this point, Lukens may be contending that the correct total of persons actually discharged during that period is 326. Accepting Lukens' reclassifications does not change the analysis materially, since very few of the persons reclassified were originally listed as having been discharged for absenteeism.

Among persons indisputably discharged, there are perhaps 15 or 20 instances in which plaintiffs' classification of the "reason" is questionable—*i.e.*, neither clearly correct nor clearly incorrect. I am not persuaded that these discrepancies and uncertainties materially undermine plaintiffs' proofs.

93. Because of its importance in Lukens' overall defense of plaintiffs' charges, this issue of absenteeism merits further discussion.

Lukens has produced impressive evidence that clearly establishes the following:

a. Absenteeism is a serious problem at Lukens.

b. Viewing the work force as a whole, blacks have much higher absenteeism rates than whites.

c. Controlling for job-level reduces the differential of absenteeism between races, but it remains statistically significant at all levels.

d. Discharged employees have much worse absenteeism records than employees who are not discharged.

Thus, Lukens argues, with considerable force, that it is at least a 99% probability that absenteeism alone explains the racial disparities in discharge decisions.

Plaintiffs counter with statistical studies which demonstrate that job-class itself is a much greater factor in absenteeism than is race (*i.e.*, job class "explains" absenteeism at least three times as well as race). It is not clear to me that this evidence provides much help to either side. If, as the evidence as a whole clearly establishes, blacks are over-represented in the "worst" jobs, where absenteeism is greatest among workers of all races, it would seem that the choice between race and job class as the better predictor of absenteeism would depend merely upon the magnitude of the over-representation of blacks in the job classes prone to absenteeism. And, since the over-representation of blacks in the "worst" jobs is largely traceable to pre-limitations discrimination, perpetuated by a bona fide seniority system, the utility of

job-class as a predictor of absenteeism is, for purposes of this litigation, severely undermined. That is, to the extent that blacks in each job classification have worse attendance records than whites in the same job classifications, that differential may properly be taken into account by Lukens in its disciplinary decisions, even though black disillusionment and frustration, and dissatisfaction with delayed advancement, may have produced the higher rate of absenteeism among blacks.

94. While the lingering effects of pre-limitations discrimination, perpetuated by the seniority system, cannot be taken into account to justify racial differentials in absenteeism, there is still the question whether such justification may properly be attributed to ongoing discriminatory practices. The crux of the absenteeism controversy can be stated as follows: Are blacks at Lukens more subject to discipline because they are less likely to attend, or are they less likely to attend because they are being discriminated against, or both?

Plaintiffs argue, with the support of impressive expert testimony from Dr. Kenneth Clark, that past discriminatory practices at Lukens, coupled with a reasonable perception that discrimination is still likely to be encountered in the work place, presents a serious obstacle to the attainment by blacks of good attendance records. I have no doubt that there are many psychological and emotional barriers which represent significant disincentives to upward mobility on the part of persons who still bear the scars of historic discrimination against members of their race.

The fact remains, however, that the issue in this case is not what vestigial burdens of guilt are properly assignable to society as a whole, but the legal liability of Lukens Steel Company. Under the law, Lukens is required to provide equality of opportunity; but it is not legally liable for failing to intrude upon the private lives of its black employees in an effort to induce them to avail themselves of opportunity. That is, unless Lukens is properly chargeable with tolerating a discriminatory environment, it has the undoubted legal right to insist that all employees, black or white, show up for work when they are supposed to, and complete their shifts as required. Mis-perceptions of the working environment, however subjectively reasonable, cannot form the basis for imposing legal liability upon a private employer. In a perfect world, the rule might well be otherwise. Greater sensitivity on the part of employers to the needs, problems, and perceptions of their employees is undoubtedly a worthy societal goal. But the law does not require perfection, and this court is not free to impose legal liability for failure to attain it.

■ To the extent, therefore, that differences in absenteeism explain racial differentials in disciplinary decisions, plaintiffs have no cause for complaint in this case.

95. It is difficult to draw firm conclusions about the discharges of non-probationary employees. At least since the present system of progressive discipline was instituted, pursuant to collective bargaining, in 1974, it is probable that the grievance procedures have adequately protected blacks covered by the collective bargaining agreement from discrimination in discharges. Most of the alleged discrimination is attributable to discharges during the probationary period.

96. In 1973 and 1974, Lukens sharply increased its work force. The "bulge" of hirings (and firings) during this period provide most of the raw data for the 1971–77 statistical studies mentioned above.

97. Lukens has presented studies (L–3019, 3020) purporting to show that blacks hired in 1973 had absentee rates in that year of 22.4%, compared to a rate of 15.14% for whites; and that for 1974 hires, the rate was 14.9% for blacks and 7.98% for whites. Lukens has also presented evidence to the effect that persons hired in each of those years, who were discharged by March 1 of the following year, had much higher absenteeism rates than persons who were not discharged (1973: 23.94% versus 13.99%; 1974: 12.96% versus 9.27%).

From these studies, Lukens argues that absenteeism in the first year is obviously (99% probability) related to prompt discharge, hence the greater absenteeism among blacks is a non-discriminatory explanation for the gross disparity in black discharges.

While the basic premise of these arguments is plainly correct—persons who are absent a lot when first hired are less likely to survive the probationary period than persons who have good attendance records—the analysis has serious flaws. The black-white comparison ("absentee rates in year of hire") is meaningless, since it lumps together persons hired at the end of the year, whose "absentee rates" would be derived from inadequate data, and persons hired earlier in the year. That is, a person hired in mid-December who missed one day's work is counted the same as a person hired in March who missed 45. Whether this defect adversely affects blacks or whites is impossible to tell; the point is, it makes the entire study unreliable.

Less serious in this context, but nonetheless interesting in view of its inconsistency with a major premise of Lukens' argument elsewhere—that probationary and non-probationary discharges must be considered separately—is the fact that both of these studies to some extent lump together probationary and non-probationary employees.

But the most telling point here is what these studies do *not* address, namely, the absenteeism rates of persons who were discharged. The contention that racial differentials in absenteeism account for racial disparities in discharges simply cannot be accepted in the face of uncontradicted evidence that the discharged blacks had better attendance records than the discharged whites.

98. Lukens concedes that the statistical evidence on discharges would justify an inference of racial discrimination, and that the evidence as a whole is consistent with that inference (*i.e.*, does not refute it). Lukens argues, however, that the plaintiffs must go further, and provide specific evidence of erroneous discharges of blacks. That is, unless plaintiffs can show that certain blacks were discharged for no valid reason, they cannot prevail on this issue.

I reject that contention. The issue is whether there is a valid explanation for the fact that Lukens' evaluations of employee-performance during the probationary period so significantly favored whites. Both blacks and whites were deemed suitable for hiring initially. The probationary evaluations are largely subjective, and performed largely by whites. The criteria, physical health and willingness to learn, are not difficult to achieve. Absenteeism is not the explanation. What is?

99. A significant clue is provided, strangely enough, in Lukens' proposed finding of fact No. 410:

"It is also undisputed in the record that virtually all discharges took place in 1973 and 1974, a period in which Lukens, for EEO and affirmative action reasons, did no pre-employment testing."

Upon careful reflection, I find this assertion remarkable, and highly significant. It seems to suggest that, if left to its own devices, Lukens would have preferred not to hire so many blacks in the first place. Since "EEO and affirmative action reasons" (so as to remain eligible for lucrative government contracts) ruled out that choice, Lukens simply achieved its objective by means of its relatively unfettered discretionary decisions during the probationary period.

Viewed in its harshest light, this amounts to overt racial discrimination. Viewed more charitably, and probably more accurately, it would seem that preconceived racial assumptions on the part of Lukens' personnel in positions of authority caused them, without evil intent, to evaluate black performance more harshly than white.

100. I conclude that plaintiffs have established that those members of the plaintiff class who were discharged during their probationary periods were discriminated against on racial grounds.

## VII. ACCESS TO SALARIED POSITIONS

101. Lukens' salaried work force, as described to the Federal Government as of July 14, 1983, consisted of the following:

| Category | Total No. Employees | Total No. Black Employees | Percentage Black |
|---|---|---|---|
| Executives | 45 | 0 | 0 |
| Middle management | 149 | 2 | 1.3 |
| First-line management (including foremen) | 432 | 30 | 6.9 |
| Professionals | 194 | 12 | 6.1 |
| Technicians | 419 | 10 | 2.3 |
| Salesmen | 17 | 0 | 0 |
| Office and clerical | 396 | 18 | 4.5 |
| Plant protection | 43 | 5 | 11.6 |
| General service workers | 46 | 10 | 21.7 |

(Exhibit P–392)

102. Most Lukens professionals and technicians are hired from outside, but other salaried positions are usually filled from within. Of the 11 top officials at Lukens in 1979, 3 had advanced from initial positions as hourly workers. Virtually all foremen and general foremen have been promoted from within the hourly work force.

103. Except for professional and technical positions, there are no educational requirements for other salaried positions. In 1979, four of Lukens' top eleven officials had only high school educations, for example.

104. There are very few blacks among Lukens' operating management. Lukens has never employed a black officer, manager, or superintendent. Lukens has had only one black supervisor, and he achieved that position in 1974, after this suit was filed. There were no black general foremen at Lukens until the 1970s, and as of January 7, 1977, only four blacks were included among the 57 general foremen.

105. I accept as correct the following statements from Lukens' proposed findings of facts Nos. 217 and 218:

"... Movements to salaried positions, unlike movements within the hourly work force, are not affected by the collective bargaining agreement, and hence present an opportunity for the company's exercise of unfettered discretion ... From the point of view of evaluating discrimination in an employer's practices, it may even be that the single most important set of data involves its selections for foremanship positions ... This is true both because of the fully discretionary nature of the selection process and because of the particular impact of foremen on the hourly work force generally...."

106. The following table shows the promotions to the position of foreman by race and year:

| Year | Total | Black | % Black |
|---|---|---|---|
| 1969 | 17 | 1 | 5.9 |
| 1970 | 23 | 2 | 8.7 |
| 1971 | 7 | 3 | 42.9* |
| 1972 | 4 | 2 | 50.0* |
| 1973 | 23 | 4 | 17.4 |
| 1974 | 29 | 7 | 24.1 |
| 1975 | 6 | 2 | 33.3 |
| 1976 | 14 | 3 | 21.4 |
| 1977 | 17 | 6 | 35.2 |
| 1978 | 22 | 5 | 22.7 |
| | 162 | 35 | 21.6 |

\* In view of small numbers involved, the figures for these years are relatively unimportant.

107. Data concerning movements from hourly to salaried positions are available only from 1971. During the entire period from 1971 through 1978, a total of 185 employees moved from hourly to salary status. Of these, 39 (21.1%) were black.

While these figures suggest that Lukens has been "promoting" blacks to salaried positions in proportion to their number among the hourly work force, they do not negative racial discrimination, since they include transfers to *all* salaried positions, and thus include movements into janitorial, clerical, and plant-guard positions.

108. The process by which persons are selected for promotion to salaried positions at Lukens has remained essentially unchanged since 1954. As Lukens concedes, the process is essentially subjective and

standardless. While employment department personnel may make recommendations, the final decision rests exclusively with the superintendent of the operating department in which the vacancy exists.

109. At various times, Lukens has required candidates for salaried positions to take various tests. Principal among these is the "Activity Vector Analysis"; each individual being considered for appointment to a salaried position is required to fill out an AVA personality evaluation form (Exhibit P-379), and this is considered in the selection process.

While some Lukens witnesses testified that there is no passing or failing grade on the AVA test, other evidence makes it clear that applicants are in fact generally regarded as having either "passed" or "failed" the AVA test. For example, Exhibit P-873 is a memorandum dated March 31, 1970, between two Lukens superintendents, referring to the fact that a particular candidate had "passed employment's AVA 12–28–67." Exhibit P-1338 is a memorandum from a superintendent to the Employment Department, requesting that a white employee be promoted to foreman even though he "failed" the AVA.

110. The AVA test has never been validated; Lukens officials were aware that the test is not highly regarded among persons knowledgeable in the field of industrial psychology.

111. Until at least 1974, Lukens also used the Wonderlic test as a screening device for promotion to foreman. Lukens has also used the Schubert General Ability Battery in filling salaried vacancies. Neither of these tests has ever been validated.

112. The evidence overwhelmingly establishes that Lukens discriminated against blacks in the selection of foremen until at least 1971. The relevant facts are set forth below:

a. In 1967, Lukens official James Hall, in a memorandum, described one black candidate for a foreman position as "poised and articulate for a Negro" (P-390).

b. Between 1956 and 1963, class member Samuel Baxter made persistent efforts to become a foreman. He was told to "forget it" and, on at least two occasions, was specifically informed by his superintendent that, but for the fact that he was "a colored man" he would be considered for the promotion.

c. During about the same period, class member Wilfred Mayfield also sought to be promoted to foreman. He was required to take a test, but was never informed whether he had passed it or not. When he was interviewed, a Lukens official asked Mayfield how he would feel about giving orders to white employees, and whether he felt white employees would be comfortable accepting orders from him. During this same period, at least two other white individuals in his department became foremen, and one of them told Mayfield that he had not been required to take any test for the job.

d. In the early 1960s, class member Jacob Meeks was told by his white general foreman that he (Meeks) might become a foreman if he would "ride the asses of the colored boys". When Meeks replied that he would "ride" the whites as well, the superintendent told him that he would never become a foreman.

e. In 1964, named plaintiff Ramon Middleton inquired of his white foreman about the possibility of being promoted to a foreman position. He was told that the only thing a black man could do for him was to "give him his sweat"; but that if Middleton behaved himself for two or three years he might be recommended for promotion to foreman. Middleton was later permitted to take a test for the position, but was never informed of the results, and was never offered a foreman job.

f. There were numerous instances, both before and during the limitations period, in which, when there was need for a temporary foreman in a particular department, only white employees would be informed of the vacancy, or be considered for promotion. (E.g., class members Eugene Lopp, Samuel Brown); and numerous instances

when blacks were "given the runaround" when they expressed interest in being promoted (*e.g.*, class members Joshua Grove, William Lambert, James Thompson).

g. The experience of class member James Thompson, beginning in the 1950s and extending well into the limitations period, is instructive. He was a very good and reliable employee in the Pits Subdivision, which was almost entirely black. For 18 years, Thompson made repeated efforts to gain a foreman position. Initially, he was told he would have to "wait his turn". Later, after several whites had been promoted to foremen in the (black) subdivision, Thompson learned from fellow-employees that he would have to take a test in order to be considered for the job of foreman.

At the time, Thompson was working the 11 p.m. to 7 a.m. shift. He received a note to report to the clerk in the Open Hearth Department at 8 a.m., at which time he was told that he was scheduled to take the foreman test at 3 p.m. that same afternoon. Thompson resided in Maryland, and a snowstorm had been forecast. He asked if it would be possible for him to take the test at a different time, so that he would not have to make the round trip to Maryland in a snowstorm, but was curtly advised that he would either take the test when it was scheduled, or not at all. Thompson drove home, obtained new snow tires, and returned to take the test as scheduled. A white foreman told him that he was the first black employee in the Pits Subdivision to pass the test for foreman. However, he was not promoted.

Thompson continued to press his efforts to become a foreman. He took the test a second time and passed, but again was not promoted, allegedly because there were other black employees, with greater seniority, who had also passed the test earlier. (This in spite of the fact that seniority is not a factor in promotion to foreman, and in spite of the earlier advice that he, Thompson, had been the first black to pass the test.) Two white foremen in the Pits Subdivision had less company seniority and less unit seniority than Thompson.

On March 31, 1970, the acting superintendent of the Melting Department wrote a memorandum to the superintendent of the Melting and Casting Department stating that Thompson had made several requests over the past three years about promotional opportunities (Exhibit P–873). In that memorandum, Thompson was compared only to other black employees. The memorandum confirmed that Thompson had been told that "his name is in the hopper". The memorandum noted that Thompson had no experience as a ladleman. Actually, Thompson had had such experience; moreover, he had never been informed that such experience was a requirement for the foreman position.

Of particular significance, the memorandum noted that Thompson had "used the term 'discrimination' when talking about the pit-floor, and promotional opportunity."

Thompson was never promoted to the position of foreman, and spent his entire 18 years at Lukens in seniority units which were predominantly black.

h. During 1969 and 1970, 40 persons were promoted to the position of foreman. Only three of these (7.5%) were black (Ex. L–66). During those years, minority employees constituted 23.8% of the hourly work force (L–60). Thus, blacks were promoted to foremen positions during those two years at a rate less than one-third their representation in the pool from which foremen were promoted; a gross disparity which, coupled with the anecdotal evidence, satisfies me that blacks were intentionally denied promotional opportunities, on account of race, at least until 1971.

113. While there was arguable improvement in the situation beginning in 1971 (four of the 11 persons promoted to foreman in 1971 and 1972 (36.3%) were blacks), it was not until 1973 (the year in which this suit was filed) that any real progress occurred. Even by September 1, 1977, blacks constituted only 12.7% of Lukens' foremen.

114. While Lukens did, from 1973 through 1978, promote blacks to foremen positions in proportion to their membership

in the hourly work force, even this fact does not rule out racial discrimination during that period, since it is at least arguable that the appropriate "pool" of applicants qualified for promotion to foreman should have included a greater percentage of blacks than their representation in the entire hourly work force, in view of the earlier systematic exclusion of blacks from promotion.

115. During the six-year period, 1972 through 1977, 94 persons (24 blacks and 70 whites) were promoted to the position of foreman. More than 40% of the blacks so promoted were initially placed in pay grades 9 or below, as compared with less than 10% of the new white foremen. This represents a disparity more than 2.7 standard deviations from the random, and is statistically significant at the .01 level.

In *Castaneda v. Partida*, 430 U.S. 482, 489 n. 17, 97 S.Ct. 1272, 1277 n. 17, 51 L.Ed.2d 498 (1977), a deviation of "more than two or three standard deviations" was suggested as sufficient statistical proof of *intentional* discrimination.

Lukens' argument that disparities in paygrade may not necessarily translate into lesser earnings is not persuasive, in the absence of evidence (presumably available to Lukens, but not presented) as to the actual compensation of these 94 persons.

## VIII. RACIAL HARASSMENT AT LUKENS

Plaintiffs presented a mass of evidence of individual instances of racial harassment and/or discriminatory treatment. More than 100 such incidents or practices have been addressed in the testimony, involving approximately 35 individual employees. While many of the individual instances predated the limitations period (plaintiffs' evidence clearly fixes about 35 incidents as having occurred within the limitations period, and about an equal number as having occurred either within the limitations period or shortly before—*e.g.*, "in the late 1960s" or "between 1965 and 1970"), all of this evidence may properly be considered in assessing the conditions which prevailed during the limitations period. That is, in determining whether instances of racial harassment or discriminatory treatment during the limitations period should be regarded as mere isolated occurrences, or as supporting an inference of pattern or practice, pre-limitations events, if not too remote, provide useful information.

I do not propose to discuss each individual instance in detail. I have carefully reviewed and considered the voluminous submissions of the parties on these subjects. Several of the more egregious examples are, in my view, too remote in time to be helpful. Many others lack adequate evidentiary support, or have been adequately explained as not involving racial considerations. Some of the more clearcut, and persuasive, examples will be set forth in the Findings of Fact immediately following.

116. In late 1973, Lyman Whitfield, a black, had been newly promoted to a foreman's position. He attempted to provide some direction and instruction to a white employee, whose nickname was "Bobcat". Bobcat angrily rebuffed Whitfield's instructions, and went so far as to state "You'll get yours, you fucking nigger."

Mr. Whitfield reported the incident, in writing, to his (white) superintendent, Mr. Cabot. Cabot arranged to have Bobcat report to his office for a discussion of the incident, but no disciplinary measures of any kind were taken against Bobcat.

Lukens' response to this evidence is totally unsatisfactory. Lukens asserts that Bobcat presumably was given a verbal reprimand, and that "there is no evidence of any basis for disciplinary action except the alleged racial remark." In the first place, the record fairly bristles with instances of black employees being severely disciplined for insubordination, with far less reason than was provided by Bobcat. But that is not the crucial point: The racial slur itself should obviously have triggered disciplinary action, quite apart from the insubordination aspect.

117. In February 1975, a white employee named Taylor improperly refused to al-

low Daniel London, a black, to use certain tools he had been directed to obtain. A heated discussion ensued, in the course of which Taylor called London a "black bastard", whereupon London struck Taylor a blow with his fist.

London was suspended for four days without pay, and was placed on probation for three years (he had no previous record of fighting, and the prescribed penalty for a first offense was four days suspension). Taylor, on the other hand, was not disciplined at all.

118. In May 1971, John Baxter, a black, was assigned to the position of checker in the Shipping Department. He was told by a white employee in that department that the job was really "a white man's job". And Charles Rice, a white gang leader in the Car Blockers Department, repeatedly told Baxter that the Shipping Department was "all messed up" by blacks.

119. Some time after mid-1968, a black employee named Boyd became foreman in the 206-inch Gas Cutting Department. Shortly thereafter, a mock-grave, complete with headstone and "KKK" symbols was constructed in that department, by unknown persons.

No disciplinary action was ever taken because of this incident. Lukens asserts that there was "no indication of who was responsible, and thus no occasion for disciplinary action."

There is no evidence as to what efforts, if any, were made to investigate this incident. I am inclined to believe that it should not have been very difficult to ascertain the identity of the probable culprits. But for present purposes, it suffices to note that if Lukens had conducted a thorough investigation, including interviews of the persons working in the department at the appropriate times, a salutary message would thereby have been delivered.

120. In 1969, Steven Branch, a black, became a millwright-helper. From that position, the next upward step is to class C millwright, class B millwright, and class A millwright. Helpers are expected to receive on-the-job training from other millwrights, in preparation for taking and passing the required examinations for each of these advancements. In the case of Mr. Branch, however, this proved difficult, because the other millwrights, all of whom were white, refused to talk to him because he was black.

Mr. Branch's difficulties continued through at least 1972. There were only 20 employees in the entire department, and it is therefore impossible to avoid the inference that the foremen and supervisors in that department were aware of the racial tension and of Mr. Branch's discriminatory treatment. No corrective action was ever taken, nor was any discipline ever imposed upon any of the white millwrights.

I reject as unsatisfactory the response proffered by Lukens, namely, that Mr. Branch eventually did manage to get promoted up the career ladder to class A millwright, and that there was no evidence that the white millwrights had been specifically assigned to teaching duties, so as to be amenable to discipline for failing to perform teaching duties. Mr. Branch was plainly entitled to be treated the same as whites in equivalent positions, and the white millwrights were plainly subject to disciplinary action for racial discrimination. This entire episode amounts to clear evidence of Lukens' toleration of racial discrimination.

121. In 1971, while employed as a millwright, Steven Branch was usually assigned to work in the 120-inch mill. On occasion, he would be assigned temporarily to work in the 206-inch mill, but whenever he was dispatched to that department, he was not allowed to work there, but was invariably sent somewhere else. At least three other black employees, Tillman, Hooper and Washington, had the same experience.

Lukens asserts that this evidence should be disregarded, because plaintiffs did not present evidence that white employees were not also turned away when temporarily assigned to the 206-inch mill. In my

view, however, the inference of racial discrimination is strongly supported by plaintiffs' evidence, in the absence of some reasonable explanation or refutation.

122. In late 1971, Charles Goodman, a black, was employed as a janitor. One of his jobs was to clean the "pulpits" (shelters raised above the ground, from which the rollers and presses run). One of the pulpits was kept locked. When given his initial tour of the area on a Friday afternoon, Goodman was provided with a key to this pulpit, which he was expected to clean before it was opened the following Monday morning. The two employees working in the pulpit at the time were white.

When Goodman arrived at the pulpit on Monday morning, he found written on the wall of the pulpit the words "Go home nigger. You don't belong here."

Goodman reported the incident to the head of the Sanitation Department, Clarence Wirth, who is white. Mr. Wirth said, "Don't worry about it. Just go on back to work." No one was disciplined for this incident, although apparently the two white employees were required to remove the offensive language from the pulpit wall.

123. In 1974, Gary Jones, a black, was assigned to learn the job of heater, by working with an experienced heater named Derring, who was white. However, Derring refused to give Jones any on-the-job training and, indeed, would not speak to him. When Jones complained to the foreman, Derring told the foreman that he would not teach Jones anything.

Eventually, Jones was reassigned to a black heater for on-the-job training. No disciplinary action was ever taken against Derring because of this incident.

124. At some unspecified time "in the 1970s" James Clifford Kennedy, the only black general foreman at Lukens, was subjected to having the words "Uncle Remus" painted on his hard hat, and "KKK" symbols scrawled on his work papers; and, apparently, his work shoes were filled with sand.

125. In 1976, William R. Mayo, a black, became involved in a dispute with his general foreman, Earl Doan, who is white. In the course of a heated discussion, Mr. Doan stated, "You black people are all alike." No action was taken against Doan for this incident.

There was evidence of several other instances, mostly in the pre-limitations period, in which Mr. Doan exhibited unenlightened racial attitudes. The fact that Mr. Mayo was not himself disciplined on this occasion does not, in my view, negative the plain implication of toleration of discrimination by Lukens.

126. On several occasions between 1969 and 1972, Kenneth Young, a black crane operator, was singled out out for unjust and harassing treatment by white foremen or supervisors (Messrs. Gay and McBride).

127. In 1972, Mr. Young, while working as a crane operator, was assigned to the loading bank of the 120-inch mill. No other blacks were employed in that area, and Young was subjected to constant harassment, especially by a white employee named Trythall. A white foreman, Harris, reprimanded Young for his constant problems in getting along with Trythall. It is probable that Harris would have imposed the same discipline on Trythall if he had had authority to do so. In fact, however, Trythall was not disciplined; and even if he had been, this would still suggest that, at Lukens, when a white employee is involved in a racial dispute with a black, both are culpable.

128. During the 1970s, a white employee named Herbert Pratt was employed as a clerk. He constantly and repeatedly made racially derogatory comments to and about black employees, apparently in the belief that such remarks were humorous. Throughout 1974 and 1975, Pratt frequently made statements to the effect that the only employees who could get ahead at Lukens are blacks, and made racially derogatory remarks about blacks who took time off.

When Oscar York, a black, complained to his general foreman, Fred Nill, a white,

about Pratt's conduct, Nill falsely claimed that he was totally unaware of the behavior. Actually, Nill could hear conversations occurring in Pratt's cubicle, and frequently laughed when he heard Pratt say something humorously derogatory about blacks.

Black employees complained to James Hall, Lukens' employment supervisor, about Pratt's habit of addressing blacks as "curly" when greeting them. In October 1978, the Coatesville chapter of the NAACP formally complained about Pratt's having listed a black employee as "Geraldine" on a posted work schedule.

In response to these various complaints, Lukens officials discussed the situation with Pratt and urged him to mend his ways, and eventually gave him a written reprimand, which became part of Pratt's personnel file. On the other hand, no suspension or other substantial discipline was ever imposed against Pratt, and his conduct continued substantially unchanged until at least 1978.

129. A white general foreman at Lukens, John Primer, made frequent derogatory remarks about black employees when they took time off. His expressed view was that blacks are lazy and do not want to work. He was never disciplined for this conduct.

130. In 1973, John Keller, a white, addressed racial remarks to a black employee in front of his supervisor, Denny Howell, also white. Howell testified at trial that he gave Keller a written warning for this conduct, but no such warning appears on Keller's personnel record. Three years later, in 1976, a similar incident occurred in the presence of Howell. Howell testified that Keller was disciplined by being suspended for one day; again, however, Keller's personnel record shows no such disciplinary action.

131. Racially derogatory graffiti have regularly and constantly appeared on the bathroom walls at Lukens for at least 30 years. From time to time, steps are taken to eradicate or paint over the offending material, but the respite is invariably brief.

The evidence does not establish the identities of the culprits, needless to say.

It is clear that Lukens deplores the practice. On the other hand, plaintiffs correctly note that Lukens has not made any concerted effort to improve the situation. Not long before the onset of the limitations period, for example, a complaint to the white supervisor of the affected area concerning a particularly noticeable and offensive racial slur on the wall was greeted with a shrug and the statement "I didn't put it there." And it was not until after the start of trial in this case that Lukens, for the first time, posted notices formally prohibiting the practice, and informing employees that persons found guilty of defacing the premises with racially offensive remarks would be disciplined.

132. On an occasion (date uncertain, but within the § 1981 limitations period) a cross was burned in an area where many blacks would normally congregate to change clothing. The record does not disclose the extent of the investigation, if any, which Lukens may have conducted after this incident. It is clear that no one was disciplined.

133. On July 12, 1978, at least three Lukens employees, one of whom apparently was a salaried employee, wore Ku Klux Klan armbands to work at Lukens. The two hourly employees involved were ostensibly given a three-day suspension as punishment; however, the scheduling of the suspension was such that one lost one day's pay, and the other lost four hours' pay.

134. From the evidence in this case, taken in its entirety, there emerges a reasonably clear picture. For decades, the races at Lukens were segregated, as a matter of official company policy. It was not until 1966 that segregation in locker room facilities was finally eliminated. Many of the same officials who occupied positions of authority during the segregated period continued to occupy positions of authority, at an even higher level, during the limitations period; and several of these were shown to

have been involved in overt racial discrimination in the pre-limitations period.

There can be no doubt that a substantial number of white employees on the Lukens payroll harbored strong feelings of racial prejudice against blacks. Lukens employees, like everyone else, became aware of the civil rights struggles of the 1960s, but that did not automatically translate into changes in racial attitudes. Indeed, given the generally prevalent ambivalence toward "demonstrations" and "demonstrators", it is reasonable to suppose that racial tensions increased, or at least surfaced to a greater extent, during that period.

It is apparent that Lukens management preferred to avoid confronting racial issues if at all possible. Some foremen and higher officials—undoubtedly, only a few—shared the racially biased attitudes of some of the white hourly employees, and most of the rest of Lukens management were apprehensive—unduly so, probably—about the potential adverse effects upon the morale of the white work force, if prompt and significant changes in favor of blacks were implemented.

The net results were (a) too-frequent toleration of continued harassment of blacks by whites, on racial grounds; (b) passive encouragement of the belief that individual acts of racial discrimination would go unpunished; and (c) a tendency to presume that any charge of racial discrimination was, almost by definition, either totally unfounded or quite trivial.

## IX. MISCELLANEOUS MATTERS

### A. *Suggestion Awards*

135. Lukens has long maintained a "suggestion system" offering rewards to employees who make suggestions for the improvement of the company's methods, products or services. The Lukens' Employee Manual states "All suggestions are investigated carefully by the people best qualified to judge their value. If a suggestion is found to be useable, you receive a cash award based on its estimated value to your company." (Exh. P–339A, p. 27.)

Over the period from 1965 through 1976, Lukens made 2,267 awards, totaling $185,-825.25 to white employees for suggestions, and 75 awards totaling $5,205.25 to black employees for suggestions (Exh. P–144) (there were also 13 awards, totaling $432.50, to employees whose race is not disclosed). Thus, black employees received 3.2% of the awards, and 2.8% of the money awarded.

136. Analyzing salaried and hourly employees separately does not significantly alter the disparity. Blacks received 3.5% of the awards given to hourly employees, and 1.6% of the awards given to salaried employees. Limiting the analysis to the limitations period does not alter the disparity: blacks received 2.9% of the awards and 3.2% of the money awarded, between 1968 and the end of 1976.

137. Plaintiffs presented the credible evidence of class member Jacob Meeks, to the effect that he and other class members had made suggestions for which they received no awards, even in cases where the suggestion was adopted and implemented, whereas white employees received awards for suggestions which proved to be impractical. Lukens presented no testimony or other evidence on this subject.

138. Lukens correctly points out that there is no evidence concerning the relative number, or the relative merit, of suggestions presented by blacks and whites respectively. Thus, the statistical evidence cannot be interpreted as proving that decisions to grant or withhold awards for suggestions were made in a racially discriminatory manner.

But this does not mean that the foregoing evidence should be totally disregarded. There are only a limited number of permissible inferences which are consistent with the statistical evidence outlined above. If the percentage of participation by blacks and whites in the suggestion program is roughly proportionate to their respective numbers in the work force, there are only two possible conclusions: either racial discrimination tainted the evaluation and award process, or blacks, as a group, sys-

tematically, year in and year out, produced suggestions having less merit than the suggestions made by whites. I regard the latter possibility as distinctly far-fetched.

If, on the other hand, only 2 or 3% of the suggestions were made by blacks (*i.e.*, if the percentage of black participation in the suggestion program was sufficiently low to justify the conclusion that the small percentage of black awards was racially neutral), it would be difficult to conclude that blacks were made aware of, and encouraged to participate in, the suggestion awards program to the same extent as their white counterparts.

In short, while the statistics of the suggestion awards program do not provide definitive answers, the gross disparities reflected therein do raise further serious questions about racial equality at Lukens.

### B. *Lukens' Affirmative Action Efforts*

139. The hierarchy of Lukens officials responsible for equal employment opportunity matters is as follows: J. Louis Irwin, as head of Industrial Relations, was the person in Lukens' management ultimately responsible for equal employment opportunity affairs from 1964 until 1979. Under him, from 1966 through 1979, was Norris J. Domangue, Director of Personnel Administration; he has general oversight responsibilities for the EEO office at Lukens.

Under Domangue, James Hall, head of the Employment Office, has been in charge of developing Lukens' affirmative action programs for submission to the Federal Government, since before 1970. At the time of trial, Barry Patterson headed the company's EEO office, assisted by John Robinson, Jr. Before the EEO office was formally organized (in about 1974), Hall was responsible for carrying out what later became that office's functions.

Of the five persons named above in this hierarchy, only Robinson is black; his services began after this lawsuit was filed.

140. Notwithstanding the massive amount of incontrovertible evidence of historical discrimination on account of race at

Lukens, all five of these persons, in their trial testimony, professed total ignorance of any racial discrimination at Lukens at any time.

141. Mr. Irwin, who has been employed at Lukens since 1933, testified that the racially disproportionate nature of seniority subdivisions (including units which were entirely black and other units which were entirely white) was the result of personal choice on the part of employees. He based this conclusion solely upon his observation that, indeed, some units were either entirely black or entirely white.

On the basis of his personal view that blacks preferred to be with each other rather than with whites, Irwin further testified that segregation of the locker rooms at Lukens occurred entirely as a result of personal choice of the employees. And, based upon his familiarity with Coatesville and its inhabitants (he having been born there), Irwin further testified that Lukens has had a policy of non-discrimination throughout his entire tenure with the company; and that, as far back as 1933, there has been a consistent trend toward greater opportunity for blacks at Lukens.

Conceding that from time to time he had received complaints about racial discrimination at Lukens, including some from the NAACP, Irwin nevertheless concluded that, as to each and every one of these complaints, intentional racial discrimination was not involved. Presented with a 1970 document which he had received from another company official, John Muhs, and which expressly referred to "past racially discriminatory hiring practices" at Lukens, Irwin testified simply that he did not know what hiring practices Muhs was referring to.

142. Mr. Domangue, who has been employed at Lukens since 1957, testified that, even before 1964, racial discrimination did not provoke complaint or discontent among black employees; that race never was a factor in the assignment of lockers; that any employee was free to take any available locker as his own; and that the racial composition of the various subdivisions at

Lukens is not a result of racial discrimination.

143. Mr. Hall testified that no management person at Lukens had ever suggested that blacks at Lukens were ever treated differently than whites because of their skin color. Hall testified that he himself has always tried to deal with people in a color-blind way.

In a memorandum prepared by Mr. Hall shortly after he was visited by EEOC investigators in 1972, he noted the race of the investigators in the opening paragraph of his report (Exh. P–389).

In 1979, John Robinson prepared a study, at Hall's direction, which showed that a disproportionate percentage of black employees who reapplied for employment at Lukens after having previously worked there were rejected by the company. The only action taken by Hall in response to this study was to examine some of the underlying data himself.

144. Mr. Patterson, after having worked in the EEO office for four years, testified that he had never encountered a single case in which he was able to conclude that Lukens was engaging in racial discrimination, or a single instance of harassment directed at blacks on racial grounds. In Patterson's view, complaints of such harassment were, for the most part, attributable to the fact that the employee in question "perceived" racial discrimination where none in fact existed.

145. The testimony of Mr. Robinson, to the effect that during his two years as Patterson's assistant in the EEO office, he likewise has found no incident in which he felt there was any racial discrimination, is largely neutralized, since he began work there after this lawsuit was filed, and has been largely preoccupied in gathering statistical information for Lukens' defense of this suit.

146. Lukens' formal affirmative action efforts were prompted by the enactment of Title VII, the promulgation of related executive orders, and Lukens' substantial involvement in government contracts.

147. In June 1964, Lukens promulgated a document entitled "Plan for Progress," setting forth what were purportedly the company's goals for achieving equal treatment of minority employees. As director of industrial relations, Mr. Irwin was chairman of the "Plan for Progress Committee".

148. A 1964 company memorandum describing the "Plan for Progress" stated that Lukens has a "longstanding policy of non-discrimination in employment"; when that statement was made, locker rooms at Lukens were still segregated.

The same memorandum, in noting that "Negroes [are] heavily concentrated in the lower job classes" lists as one potential contributing factor to that phenomenon "lack of personal motivation and initiative".

149. In late 1970, Lukens promulgated a document entitled "Affirmative Action Policy" which was identified as "a revision of Lukens' 'joint statement of Plan for Progress' adopted in 1964." This document, written by Mr. Hall, also refers to Lukens' "longstanding policy of non-discrimination in employment."

150. According to the 1970 affirmative action policy, "a Plan for Progress Committee was formed, and a program of action initiated" beginning in 1964; and the Committee was "charged with establishing policy, outlining objectives, stimulating action, and reporting results." The evidence at trial makes clear that the activities of this Committee and the results of its efforts, if any, were decidedly limited.

151. As the director of Industrial Relations, Mr. Irwin sent a memorandum to various Lukens officials in 1970, directing that Lukens' Affirmative Action Program be considered "confidential", and "to be made available only to committee chairmen and members of the Advisory Committee." The committees referred to were formed ostensibly for the purpose of implementing the Affirmative Action Program; the committee chairmen were all white Lukens officials. There is no explanation in the record as to why the program should have been considered "confidential"; indeed, Mr. Do-

mangue testified that he knew of no reason why the company's Affirmative Action Program could not have been shared in its entirety with Lukens' employees, or why the program should have been marked confidential.

Lukens asserts, in its post-trial submissions, that the Affirmative Action Program had to be kept confidential because it contained information concerning Lukens' work force and operations which might have aided its competitors. Apart from the fact that there is no evidence which supports this argument, it seems obvious that the existence of an affirmative action program, and a redacted version of the plan, could have been disclosed.

152. Under the Affirmative Action Program, an Affirmative Action Committee was established. Mr. Hall was a member of that Committee. Mr. Hall testified that, while the Committee did not meet on any scheduled basis, it did meet fairly often. Actually, however, between April 1971 and October 1972, a period of 17 months, there was not a single meeting of the Affirmative Action Committee (P–1214).

153. The 1970 affirmative action policy document refers to "disproportionate, racially segregated, seniority units" at Lukens (P–114, p. 3). But the 1972–1973 affirmative action policy document, prepared after the charges involved in this litigation had been filed with the EEOC, contains no such reference (P–124). There had been no substantial change in the racial composition of seniority units in the interim.

154. The Office of Federal Contract Compliance Programs ("OFCCP") makes periodic reviews of Lukens Affirmative Action Programs and efforts, for the purpose of ensuring compliance with Executive Order 11246. The results of these reviews have a substantial bearing on whether Lukens may continue to contract with the Federal Government.

155. As part of its obligation under this review, Lukens supplies to the OFCCP statistics showing the breakdown of the work force between craft and non-craft jobs. In making this breakdown, Lukens did not use the job classifications set forth in the collective bargaining agreement, but rather classified as craft jobs additional jobs not so characterized in the collective bargaining agreement. This enabled Lukens to report to the OFCCP that minorities were represented in craft jobs at much higher percentages (more than 50% higher) than would have been reflected if the collective bargaining agreement classification scheme had been utilized.

156. Mr. Hall, who had major responsibility for dealing with the OFCCP, testified at trial that Lukens' Affirmative Action Program had been approved by the OFCCP. It turns out that Mr. Hall was in error.

The OFCCP has determined that Lukens' 1978–1979 Affirmative Compliance Program is not acceptable (P–1405). In a letter to Charles A. Carlson, Chairman of the Board of Lukens, the Director of the Philadelphia Office of OFCCP, Thomas S. Bush, stated, "It has been determined as of September 21, 1979, that Lukens Steel Company does not have an acceptable written Affirmative Action Compliance Program." This letter was a confirmation of matters discussed during a "closeout conference held September 21, 1979" at Lukens, attended by Messrs. Irwin, Domangue, Hall, Patterson, and Robinson. The letter further states that "Your facility cannot be considered in compliance with Executive Order 11246, as amended, unless a binding conciliation agreement is received which reflects a statement of each deficiency, the citation of the violation, and the corrective action taken."

When Lukens responded to a subpoena issued by plaintiffs, requiring all correspondence from the OFCCP regarding Lukens' affirmative action compliance status, no conciliation agreement was included (P–1425).

157. Mr. Patterson, the Equal Employment Opportunity Administrator at Lukens, has been employed at Lukens since 1971, and has headed the EEO office since January 1976. He had no professional ex-

perience in the equal employment opportunity area, nor had he participated in any equal employment or civil rights organizations. Throughout his first five years at Lukens, he was involved exclusively in the area of public relations.

158. Among Patterson's responsibilities as head of the EEO office is the handling of all official and unofficial complaints of discrimination filed against the company by applicants or employees. He also has responsibility for drafting the company's Affirmative Action Plans, and for dealing with governmental agencies on equal employment opportunity problems.

159. Mr. Patterson has been aware, throughout his tenure at Lukens, that there are job groups which are disproportionately white and other job groups which are disproportionately black. Nevertheless, as head of the EEO office, he has never engaged in any investigation, and does not know of any investigation, as to why these disparities existed. He did not conduct, and does not know of any, investigation into the disparate impact of the transfer procedure at Lukens.

160. At the time of trial, Mr. Patterson had been head of the EEO office at Lukens for four years. Twenty members of the plaintiff class testified at trial that they did not even know who he was. This does not, of course, mean that they did not know there was an EEO office at Lukens, but it strongly suggests something less than enthusiastic dedication to EEO issues on the part of that office.

161. In late 1978, class member Wilfred Mayfield felt that he was being discriminated against on racial grounds in connection with certain scheduling problems. His white supervisor, Mr. Glazer, agreed that there was merit to his complaint, but stated that he had no power to change the situation, and suggested that Mayfield consult his union representative. Mayfield's dissatisfaction continued, after consultation with union representatives, and he discussed his problems with OFCCP officials who happened to be in the Coatesville area. They suggested he consult Mr. Patterson.

Mayfield did not know who Patterson was, and the OFCCP officials told him. Mayfield consulted eight or ten other black employees, none of whom had ever heard of Patterson.

Mayfield arranged an appointment with Patterson for the following day at 4 p.m. When he arrived for his appointment, Patterson was not present, but his assistant, John Robinson, met with Mayfield. In the course of their conversation, Mayfield asked Robinson how long the EEO office had been in existence, and learned that it had been established about three years earlier. Mayfield then asked why it was that so few people knew about the office. Robinson told him that the EEO office had orders from "higher up" to operate on a very low key.

Mayfield was told by Robinson that he would set up a meeting with the appropriate officials to discuss Mayfield's problem. About a week later, Mayfield was told that the meeting had been set up, but that Mayfield's attendance would not be appropriate. Mayfield never received any further information about whether the meeting was held, or what the results may have been. Periodic inquiries since then produced no results. As late as February 1980, during a recess in the trial of this case (some 14 months after the initial contact with the EEO office), Patterson advised Mayfield that he was "still working on" the problem.

162. Lukens has undoubtedly made some efforts to pursue affirmative action goals during the limitations period, and has made some progress. As noted above, Lukens established an EEO office, or its equivalent, in 1974. The EEO office is located in close proximity to the employment office. Personnel in the employment office have been made aware of Lukens' commitment to affirmative action and equal employment opportunity during their training and at weekly meetings, attended by representatives of the EEO office. Lukens has undertaken a program of recruiting at black colleges, including Cheyney State College, Lincoln University and

Southern University; has participated in cluster programs at black institutions in other parts of the country, including Atlanta University; and has implemented programs at the local level to increase employment opportunities for blacks. Specifically, since 1968, Lukens has worked with the Coatesville area school district in a hard-core unemployment program ("STEP") and a counseling and training program ("CASH"). And Lukens has been involved in the National Alliance of Businessmen JOBS program, involving commitments to the hiring of underprivileged individuals, principally black.

On the other hand, none of these programs or efforts appears to have had much actual impact upon the conditions and atmosphere of the work place. At least until well after this lawsuit was filed, Lukens' efforts were plainly kept rather quiet, so as to avoid both the "problems" with white employees harboring racial prejudices, and the need to acknowledge, and face up to, the reality of past and continuing discrimination. The inference is reasonably clear that Lukens was primarily interested in providing evidence of progress sufficient to satisfy the OFCCP and other governmental agencies, but either did not understand, or resisted the idea, that genuine and substantial deviations from customary attitudes and employment practices would be required.

163. For example, so far as the record discloses, only a single black person was hired by Lukens as a result of its allegedly extensive college recruitment efforts.

164. Class member Al Carey, a black, served for two years as Lukens' "recruiter" among black colleges in this vicinity. Because Lukens was primarily interested in college graduates with technical backgrounds, Mr. Carey admittedly had somewhat less opportunity for recruitment than did recruiters from other corporations. Nevertheless, during his two-year stint, he located, and referred to Lukens, at least 16 qualified blacks, all of whom applied for employment. None of these 16 applicants was hired.

After two years, Mr. Carey quit the recruiting program. It was his feeling that he was being "used" by Lukens, in an effort to create the appearance of equal opportunity, but that genuine commitment to that principle was lacking.

165. Lukens points to two other aspects of the evidence, as demonstrating Lukens' efforts to ensure greater opportunity for minority employees: (a) an instance in which Lukens allegedly lowered the passing score on a test so that a black could obtain promotion, and (b) Lukens' ongoing, albeit unsuccessful, efforts to merge seniority units. Upon closer examination, however, these arguments backfire.

a. On an occasion in 1975, the passing score on a shop math test was lowered in connection with a job posting for the Mechanical Riggers Subdivision, and this enabled class member Hilton Matthews to qualify for a transfer into the unit. But the same lowering of the passing score also enabled two white persons, Messrs. Tomaski and Perring, to qualify; and, when the transfers were effectuated, the two whites were placed above Matthews on the seniority list, even though they had less company seniority, and equal unit seniority, with Matthews.

b. Under the terms of the collective bargaining agreements, the company has complete control over job assignments and changes within a seniority unit, but cannot assign an employee in one seniority unit to perform work in another seniority unit. And transfers from one seniority unit to another are, of course, governed by the job-posting and company seniority procedures. Accordingly, a fairly constant theme of collective bargaining negotiations over the years has been the company's desire to reduce the number of seniority units through mergers and consolidations, and the unions' opposition to these efforts. But, as the evidence presented by the defendant unions demonstrates, the company's merger proposals have never been put forward as intended or expected to ameliorate racial disparities among the existing units; indeed, many of these proposals

would have merged white units with other white units, or black units with other black units.

## X. PLAINTIFFS' CLAIMS AGAINST THE UNION DEFENDANTS

166. The defendant International Union is the recognized bargaining agent, certified by the National Labor Relations Board, for each of its locals, including Locals 2295 and 1165. Collective bargaining agreements are negotiated by the International Union on behalf of local unions. In practice, the International Union negotiates "basic steel" agreements with the nine or ten largest steel companies, leaving to local bargaining only the implementation of the basic steel terms or the correction or improvement of those terms to suit local conditions.

167. The International and the local unions jointly "act exclusively as the member's agent" in grievance proceedings and "other matters relating to terms and conditions of employment arising out of the employer-employee relationship" (U–359, Article XVII, Section 3, p. 92). An International staff representative is present at Lukens at all times, and is in charge of the local collective bargaining, and also all fourth-step meetings and arbitrations in the grievance process. The district directors of the International Union also have some responsibilities for the local collective bargaining negotiations.

168. Since 1956, all hourly employees at Lukens have been required to join either Local 1165 or Local 2295 after having been employed by the company for 30 days.

169. At the time of trial, Local 1165 had approximately 2600 members, and Local 2295 had approximately 80 members (down from a World War II maximum of approximately 600 members).

170. Local 2295 has jurisdiction only within the Welded Products Division of Lukens, which has historically been predominately white. Accordingly, Local 2295 has had very few black members (not more than 12 at any one time since 1967) and has never had a black president.

171. Local 1165 has many black members (presumably, approximately 25% of the membership) and blacks have actively participated at its meetings and in its affairs, although no black has yet been elected president of Local 1165.

172. As discussed previously in this Opinion, the evidence as a whole does not preponderate in favor of a finding that the union defendants (or, more properly, their predecessors) were motivated by racial considerations in establishing the seniority system at Lukens. And, under established precedent, the unions' resistance to the abandonment or undermining of the seniority principle as an acceptable method of achieving greater racial equality is not actionable.

173. There is a great deal of evidence pertaining to pre-limitations events which casts serious doubt on the unions' total commitment to racial equality during that period. For example:

a. The 1962 "basic steel" negotiations produced agreement upon the inclusion of a provision outlawing racial discrimination. At the local negotiations at Lukens, however, the possibility of including that clause in the Lukens agreement was not even discussed. No such non-discrimination clause was included in a Lukens agreement until 1965; and then, apparently, it came as the result of a suggestion by the company, rather than the unions (and one need not be unduly cynical to suggest that, by that time, it was thought desirable to include such a clause, for OFCCP purposes).

b. The unions never took any action to complain about the segregated locker facilities or other blatantly discriminatory practices at Lukens. Indeed, when, pursuant to pressure from the Pennsylvania Human Relations Commission, Lukens was required to complete the process of desegregating the locker rooms, the unions' International representative informally allowed Lukens an extension of time to complete the transition. As noted elsewhere in this Opinion, the process of desegregation was not complete until 1966.

c. In 1962 or earlier, class member Joshua Grove complained to Local 1165 President Joseph Foy about the segregated facilities. Foy told Grove that the company would not then agree to integrate and upgrade the locker room facilities, and asked Grove to delay filing a charge with the Pennsylvania Human Relations Commission, voicing concern over possible "repercussions" if racial integration were pushed.

d. In the mid-1960s, a group of black employees in the Open Hearth Pits Subdivision organized a committee and complained to the company about the segregated facilities and other discriminatory policies. Although at least two members of the committee were union shop stewards, they received no help from the union. Indeed, at trial, the gentleman who had served as president of Local 1165 from 1964 to 1970, testified that he was unaware of the existence of any such committee, and had no recollection of any group of black employees having complained about racial matters at the time.

174. The evidence reviewed in the preceding findings does not provide grounds for relief against the defendant unions in this case. We are concerned here with actions and practices during the limitations period.

175. Plaintiffs assert that the unions have discriminated against blacks during the limitations period in its handling of grievances under the collective bargaining agreement. Upwards of 8,000 grievances have been filed at Lukens during the limitations period. The steady increase in grievance filings each year has not produced a corresponding increase in the capacity of the grievance-processing system to handle complaints. As a result, the grievance procedures at Lukens are characterized by the following:

a. Serious grievances (*i.e.*, those involving more than a four-day suspension, and those involving discharges) are given priority. And, because each "zone" within the plant handles its grievances separately at the early stages, and fourth-step hearings are held only once or twice each month, an attempt is made to allocate the hearing-time among the zones.

b. The time limits imposed by the collective bargaining agreement for scheduling the various steps of the grievance procedure are not being met, and are largely ignored.

c. In an effort to alleviate the backlog, there has been an increasing tendency on the part of the unions to dispose of less-serious grievances by simply withdrawing them "without prejudice". This means that the affected employee gets no relief but that the union is not precluded from challenging that grievance on the merits in a later grievance proceeding.

In short, the manner in which the unions handle employee grievances at Lukens does not fully comport with the terms of the collective bargaining agreement, and is subject to legitimate criticism. There is, however, no hard evidence to support an inference that these inadequacies disadvantage blacks to a greater extent than whites. Some members of the plaintiff class testified to a general perception among black employees that their grievances are handled less expeditiously and with less enthusiasm than the grievances of white employees, but it seems clear from the evidence that whites and blacks alike have reason to complain.

176. An analysis of the grievances which reach the final step, arbitration, reveals that grievances asserted on behalf of black employees represent approximately the same percentage of such grievances as the percentage of blacks in the hourly work force. And some evidence presented by Lukens suggests that there is approximately the same racial breakdown of grievances initially filed, although the evidence is not entirely clear on that point. And the union defendants have presented evidence tending to show that, among grievances pursued through arbitration, success was achieved on behalf of black grievants at a slightly better percentage than whites. Specifically, 46.5% of black grievants

achieved success in arbitration, compared to 31.8% of white grievants.

I find it impossible to draw any definitive conclusions from this evidence. It may mean that blacks are more likely than whites to be the targets of undeserved discipline serious enough to warrant arbitration. It may mean that either the unions, the company, or both are more inclined to, or at least more successful in, settling white grievances short of arbitration. Or it may mean that the unions more diligently pursue black grievances than white. It may mean none of the above.

■ Plaintiffs correctly point out that, in the absence of evidence showing what percentage of all grievances, black grievances and white grievances are pursued through arbitration it is difficult to draw any intelligent conclusions as to whether the unions do or do not discriminate against blacks in their handling of grievances. Plaintiffs complain that the unions' records on grievances are filed by grievance number, rendering it exceedingly difficult to locate and verify particular grievances; rendering it exceedingly difficult to achieve the required racial analyses. The unions contend that, while admittedly difficult, such information could have been derived from the unions' records, but plaintiffs failed to explore it. In my view, plaintiffs' generalized evidence concerning perceptions about racial inequities in the handling of grievances does not, without more, establish a prima facie case in this respect. I do not believe that any significant adverse inference can properly be drawn from the manner in which the union keeps its records pertaining to grievances.

In short, the evidence as a whole is inconclusive on this issue.

■ 177. Plaintiffs are on firmer ground, however, with respect to the unions' repeated failures, during the limitations period, to include racial discrimination as a basis for grievances or other complaints against the company.

a. *Probationary Employees.* Under the terms of the collective bargaining agreement, the protections afforded probationary employees are quite limited; so much so, in fact, that the unions have pursued a uniform policy of not filing grievances on behalf of probationary employees, for any reason. Ever since 1965, however, the collective bargaining agreements have prohibited the company from discriminating against any employee, probationary or permanent, on racial grounds (*see, e.g.,* N.T. 24.97–99, 24.104–107).

The union knew that blacks were being discharged by Lukens at a disproportionately higher rate than whites (U–248; N.T. 14.58–59).

b. *Testing.* Although the unions did object to Lukens' use of tests of all kinds, the unions never based their opposition on the assertion that the tests had racially disparate impact, although the unions were certainly chargeable with knowledge that many of the tests, particularly the Wonderlic, were notorious in that regard. Instead, the unions argued only their traditional position (tests undercut the seniority principle, by favoring younger employees who have recently been in school over older employees whose formal education is more remote).

c. *Grievances.* It is undisputed that the unions were reluctant to assert racial discrimination as a basis for a grievance and almost never did so until after this suit was filed, even though many black employees asserting grievances complained about discriminatory treatment and harassment, and even though the union itself believed that racial discrimination was involved in the grievance. At first blush, the unions' explanation for this policy seems reasonable: In order to establish that a particular grievance had merit, it was necessary to establish a violation of the collective bargaining agreement. If such violation could be established, it was unnecessary to go further, and establish racial animus. And the company tended to "get its back up" and resist any charge of racial discrimination; or at least that was the union's perception of the company's position.

Upon reflection, however, I find this explanation unacceptable. In the first place, it overlooks the numerous instances of harassment, which were indisputably racial in nature, but which did not otherwise plainly violate a provision of the collective bargaining agreement. Thus, grievances involving no loss of pay or permanent disciplinary record were virtually ignored.

In the second place, it seems obvious that vigorous pursuit of claims of racial discrimination would have focused attention upon racial issues and compelled some change in racial attitudes. The clear preference of both the company and the unions to avoid addressing racial issues served to perpetuate the discriminatory environment. In short, the unions' unwillingness to assert racial discrimination claims as such rendered the non-discrimination clause in the collective bargaining agreement a dead letter.

178. The unions argue that much of plaintiffs' case relates to discrimination in initial job assignments at Lukens and that, since the collective bargaining agreements do not give the unions any voice in initial assignments, they can bear no legal responsibility for any such discrimination. It is true that the unions have no control over the hiring process; selection of employees is entirely the prerogative of management. But once employees are hired, they are entitled to the protections of the collective bargaining agreement; and one of those protections is a prohibition against racial discrimination. To require blacks to continue to work in lower paying and less desirable jobs, in units disparately black, is to discriminate against them in violation of the collective bargaining agreement (and, of course, also in violation of Title VII). It is very clear, on the record in this case, that the defendant unions never sought to avail themselves of this rather obvious mechanism for protecting the interests of their members.

■ Contrary to the union's arguments, mere union passivity in the face of employer-discrimination renders the unions liable under Title VII and, if racial animus is properly inferrable, under § 1981 as well. *McDonald v. Santa Fe Trail Transportation Co.*, 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976); *Macklin v. Spector Freight Systems, Inc.*, 478 F.2d 979, 989 (D.C.Cir.1973); *Dickerson v. United States Steel Corp.*, 472 F.Supp. 1304, 1353–54 (E.D.Pa.1978) and 439 F.Supp. 55, 62–63, 83 (1977).

Moreover, the evidence in this case proves far more than mere passivity on the part of the unions. The distinction to be observed is between a union which, through lethargy or inefficiency simply fails to perceive problems or is inattentive to their possible solution (in which case, at least arguably, the union's inaction has no connection with race) and a union which, aware of racial discrimination against some of its members, fails to protect their interests. A union which intentionally avoids asserting discrimination claims, either so as not to antagonize the employer and thus improve its chances of success on other issues, or in deference to the perceived desires of its white membership, is liable under both Title II and § 1981, regardless of whether, as a subjective matter, its leaders were favorably disposed toward minorities.

## XI. INDIVIDUAL CLAIMS

### A. *Charles Goodman*

179. When hired by Lukens in 1965, named plaintiff Charles Goodman had had 11 years experience as an acetylene burner, and requested assignment to a burner job. He was assigned instead to a laborer's job in the pool. He claims, further, to have been arbitrarily and discriminatorily denied a transfer to an all-white subdivision (Central Stores) in 1966, and to have experienced discriminatory disciplinary treatment in the early years.

Most of these allegations involve pre-limitations events. Moreover, the record leaves open the possibility that no position as burner was open when Goodman was first employed, and that there may have been no openings in Central Stores when

he sought transfer. The pre-limitations disciplinary incidents are not actionable here, and the evidence concerning them is sufficiently cloudy to preclude their consideration as background for post-discrimination matters.

180. Mr. Goodman suffered a heart attack, apparently some time in late 1969. In January 1970, he was permitted to transfer temporarily to the Plant Protection Department, as a security guard. It was standard practice for Lukens to permit employees who, by reason of physical disability, had difficulty performing the more strenuous work of the operating departments, to work as security guards in the Plant Protection Department. Most of the employees, and all of the supervisory personnel, in the Plant Protection Department were white.

Unfortunately, it was rather common for security guards to be caught napping while on duty. The evidence as a whole leaves little doubt that such infractions by white guards were almost always overlooked, whereas such infractions on the part of black guards were likely to result in the imposition of discipline. During his tenure as a temporary guard, Mr. Goodman was twice warned about sleeping on the job, whereas more flagrant violations by white guards went unpunished.

Moreover, the two warnings Mr. Goodman received occurred in January and February 1971, some four months after he had been denied a permanent assignment to the Plant Security Department. In August and October 1970, Mr. Goodman was denied permanent assignment in that department, whereas four white employees, two of whom had less seniority than Goodman, were granted permanent assignments. Accordingly, Lukens' purported reliance upon the alleged sleeping incidents as a reason for turning down Goodman's promotion cannot be accepted.

I find that Charles Goodman was discriminated against on racial grounds in being denied a permanent assignment to the Plant Security Department.

181. Mr. Goodman also complains that his eventual discharge from employment at Lukens was discriminatory. His active employment at Lukens ceased in 1975, because of medical disability. He was finally terminated in 1978, because he failed to respond to a notice sent to him by the company. Mr. Goodman claims that he did not receive the notice, and this may be true; but it is clear that Lukens did send the notice to the address which Goodman had provided. In these circumstances, it is clear that Mr. Goodman has failed to establish that racial considerations entered into the discharge decision.

### B. Lymas Winfield

182. In 1965, Lymas Winfield, at the suggestion of his black foreman, took a reading comprehension test, to become eligible for training for the position of foreman. He was told by his white general foreman, George Wasko, that he had passed the test, and that he could become a permanent foreman after going to foreman school. However, Winfield was not admitted to the school.

183. In 1967, Winfield took a second test, similar to the first, and was again told that he had passed. He still was not placed in the school.

184. From 1965 through 1970, Winfield often worked as a temporary foreman, sometimes for as long as 27 weeks at a stretch. In August 1970, he asked Wasko whether he could become a permanent foreman, and was told that he would have to take another test because the test had been changed. Winfield checked at the Employment Office and learned that the foreman test had not been changed. When Wasko was confronted with this information, he told Winfield that he wanted to have a more recent score. Winfield therefore took the test for a third time. Winfield repeatedly asked Wasko about the results of the test, but for several months Wasko continued to state that he had not yet received the results. Eventually, Wasko told Winfield that he had passed the test and that Winfield would be sent to the first

**1162**

available foreman school. More than three years elapsed, however, before Winfield was sent to the foreman training school.

In the interim, Winfield encountered overt racial discrimination from a white salaried employee named Ted Corbo, whose job it was to tell Winfield what work was to be done by Winfield's crew. *Inter alia,* Corbo at one time stated that he was accustomed to dealing with "a different type of people than Winfield"; in context, this had racial connotations.

In early 1973, Winfield overheard Mr. Wasko tell another Lukens employee that Winfield was the best foreman he had. Shortly afterward, Winfield again asked Wasko about being promoted to a permanent foreman position. Wasko stated that this would require the approval of the superintendent, Horace Potter, and that he would inquire. A few days later, Wasko called Winfield into his office and stated that he, Winfield, was the lousiest foreman he had ever had, and that his request for promotion was being denied.

About a week later, a white employee, Lou Anderson, was transferred into Winfield's gang for the express purpose of learning the job of turn foreman being performed by Winfield (Winfield had previously been informed that an employee was not permitted to transfer from one gang to another).

As a result of Winfield's discussion of his situation with a black official of the union, John Robinson, the matter was referred to the company-union Civil Rights Committee. A series of meetings followed, or were scheduled and not held, or were scheduled without Winfield's knowledge. These culminated in a "showdown" meeting with Mr. Ryan, Lukens' manager of labor relations. In the course of that meeting, Wasko stated, falsely, that Winfield had failed the foreman's test three times. Winfield suggested that someone immediately check with the Employment Office to verify the test results; although the Employment Office was open at the time, no check was made.

The outcome of the meeting was a decision that each of Winfield's supervisors would work closely with him for a week to learn what the job entailed and how he was performing. Compliance with this agreement was, however, spotty at best, and to some extent sabotaged by Mr. Wasko.

A few months later, Winfield became a named plaintiff in this lawsuit. Three months later, on September 18, 1983, Lukens official James Hall sent a "personal and confidential" memorandum to Norris Domangue, suggesting that Winfield should in fact be made a foreman "upon his graduation from the foremanship course. This is only a preliminary thought, however, which must be borne out by further investigation and, of course, discussion with our attorney."

In October 1973, Winfield was sent to foreman school, but continued to work as a temporary foreman.

Various other persons, some white and some black, became permanent foremen thereafter, but Winfield did not. In 1974, Winfield despaired of ever becoming a foreman, and refused to continue further as a temporary, choosing instead to return to a job in the labor gang. He began to drink to excess, and experienced various physical and psychological problems.

In December 1974, Winfield telephoned the Philadelphia EEOC office to explain the problems he had been having in his attempts to become a foreman, and was invited to come in for an interview. The very next morning, however, Lukens' newly appointed equal employment counselor approached Winfield, and asked if he had been in contact with the EEOC (although she did not state what occasioned the inquiry). She requested that he delay further contact with the EEOC for two weeks, so that she could attempt to adjust the matter in the interim. She stated that she believed Winfield would be offered the job of permanent foreman and, in fact, in January 1975, after 10 years as a temporary foreman, Winfield finally became a permanent foreman.

185. In a 1973 memorandum, Lukens employment supervisor James Hall, having

investigated Winfield's complaints, expressed the conclusion that Winfield's superiors had displayed poor judgment and that "It ... appeared there was a double standard of a sort." (P–1080.)

■ 186. I find from the evidence as a whole that Lymas Winfield's promotion to the position of permanent foreman was delayed for at least eight years on racial grounds and, after the filing of this lawsuit, also in retaliation for his participation in this litigation.

### C. *Romulus Jones*

187. Named plaintiff Romulus Jones was hired by Lukens in June 1969 as an accounting trainee in the Accounting Department of the comptroller's organization, having just graduated from Penn State University with a degree in accounting. He was then one of two blacks out of the approximately 45 employees in Lukens' main office building (the other black was a janitor). Ten years later, in November 1979, Jones and the janitor were still the only black employees in the building.

■ 188. During this 10-year period, Jones was repeatedly passed over for promotion. At least seven white employees, many of them less senior, and none shown to be better qualified than Jones, received promotions.

The evidence undoubtedly establishes a *prima facie* case of racial discrimination in denial of promotions. Lukens has attempted to rebut plaintiffs' case by presenting evidence to the effect that Jones' job performance was only marginal. Indeed, the company suggests that, had he not been black, Jones would have been dismissed. The job-evaluations underlying this testimony were, however, all prepared after Jones complained to the EEOC. On balance, I reject these explanations as post-hoc rationalizations.

I find that Romulus Jones was discriminated against on racial grounds by being denied promotions.

### D. *Dock L. Meeks*

■ 189. Many of Mr. Meeks' complaints relate to the pre-limitations period. Except to the extent that relief is herein afforded to the plaintiff class, Meeks' complaints about discrimination in work-assignments, incentive pay, scheduling, etc., do not persuade me that he is entitled to individualized relief in this case.

### E. *John R. Hicks, III*

■ 190. I have concluded that the named plaintiff John R. Hicks, III has not established a *prima facie* case of racial discrimination. His allegedly discriminatory treatment in the matter of discipline simply cannot stand, in the face of his deplorable record of absenteeism (approaching or exceeding 50%). If anything, the evidence tends to suggest discrimination against persons suffering from obesity, rather than racial discrimination.

### F. *Ramon L. Middleton*

■ 191. As noted above, I conclude that Ramon Middleton was discriminated against in being delayed entry to the Strand-Cast Unit, but I reject his claims relating to the "No. 1 operator" job.

### G. *David Dantzler, Jr.*

192. At an earlier stage in this case, on October 9, 1979, I found that Mr. Dantzler had been discriminated against in disciplinary matters, and granted relief, including reinstatement with back pay. I remain persuaded that that disposition was correct, and conclude that no further individual remedy is due Mr. Dantzler in this case.

### XII. CONCLUSIONS

1. The defendant Lukens Steel Company has discriminated against the plaintiff class, in violation of Title VII, during the limitations period applicable to this case, in the following respects:

a. Initial job assignments, including assignments to the pool as distinguished from seniority units, and to craft jobs as distinguished from non-craft jobs.

b. In promotions and/or transfers to better-paying craft jobs.

c. In denying incentive pay to employees in the Pits Subdivision.

d. With respect to discharges of employees during their probationary period.

e. With respect to promotions to salaried positions.

f. In its toleration of racial harassment.

2. In the same respects, defendant Lukens Steel Company has discriminated against the plaintiff class on racial grounds in violation of § 1981.

3. The defendant unions have discriminated against the plaintiff class on racial grounds, in violation of Title VII and § 1981, in the following respects:

a. Failure to challenge discriminatory discharges of probationary employees.

b. Failure and refusal to assert racial discrimination as a ground for grievances.

c. Toleration and tacit encouragement of racial harassment.

4. The named plaintiff Charles Goodman is entitled to relief against the defendant Lukens Steel Company for discriminatory denial of a permanent position in the Plant Protection Department.

5. Named plaintiff Lymas Winfield is entitled to relief against the defendant Lukens Steel Company for improperly denying him promotion to the position of permanent foreman.

6. Named plaintiff Romulus Jones is entitled to relief against the defendant Lukens Steel Company for discriminatory denial of promotions.

7. Named plaintiff Ramon Middleton is entitled to relief against the defendant Lukens Steel Company for discriminatory delay in his transfer to the Strand-Cast Unit.

8. In all other respects, the claims of the above-named plaintiffs, and of the other named plaintiffs, are dismissed, as to their claims for individual relief.

## ORDER

AND NOW, this 13th day of February, 1984, it is ORDERED:

1. That judgment is entered in favor of the plaintiff class and against all defendants, on the issues of liability specified in the accompanying Opinion.

2. Judgment is entered in favor of the named plaintiffs Charles Goodman, Lyman Winfield, Romulus Jones, Ramon Middleton and David Dantzler, Jr., and against the defendant Lukens Steel Company only, on liability, as to the issues specified in the accompanying Opinion.

3. In all other respects, the individual claims of the named plaintiffs are DISMISSED.